NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0301n.06

FILED
May 31, 2017
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| DREW D. MANNS, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | OPINION |

BEFORE:   DAUGHTREY, KETHLEDGE, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  Drew Manns pleaded guilty to four counts of mailing threatening communications and sending false information.  He was sentenced to 51 months' imprisonment.  Manns challenges the district court's application of a sentencing enhancement under § USSG 3A1.2(a) and (b), which increased his total offense level under the Sentencing Guidelines by six levels.  Because the district court properly applied the sentencing enhancement, we **AFFIRM** Manns's sentence.

## I.     BACKGROUND

In August 2014, Drew Manns was incarcerated in Ohio's Marion Correctional Institution, serving a five-year sentence for a state crime.  On August 21, the Summit County Prosecutor's Office in Akron, Ohio, received an envelope addressed to its Criminal Division, with a return address from Robert Penn at Marion Correctional Institution.  The envelope contained a letter with "ANTHRAX!!!" written across the top, and a message stating that the sender intended to

"murder" the recipients with anthrax, apparently in retribution for giving the sender "15 years to life, back in August 1994."[1] The envelope also contained a white powder. Two floors of the building were placed under lock-down procedures as the Akron Fire Department sent a Hazmat crew to secure the letter and substance. Upon testing the powder, the Akron Fire Department determined it to be a low-calorie sugar substitute. Marion Correctional Institution was contacted about the incident, and Penn was placed into segregation pending investigation. The following day, August 22, the Summit County Clerk of Courts' office received a similar letter,[2] reading "Anthrax" across the top, with the same return address and white powdered substance inside the envelope. The Clerk of Courts underwent the same lockdown procedures and Hazmat protocols. The substance was once again found to be a low-calorie sugar substitute.

When investigators interviewed Penn about the letters, he denied sending them or having any knowledge of their existence. Instead, he provided investigators with the name of another inmate: Manns. Penn believed Manns "was upset with" him, in part because of a dispute over an AVI vending card, which inmates use to purchase snacks. A few days after Penn's interview, an officer at Marion Correctional Institution received an anonymous letter under his door. In the letter, the writer stated that Penn had told him that he wanted to retaliate against Summit County,

---

[1] The text of the letter read:

> You bastards gave me 15 years to life, back in August 1994. It's now Aug 2014, for 20 fucken years, I've sat behind these bitch ass walls. Now ur niggaz time is up. You all will fucken die now. You bitches will remember this nigga. You bitches can't do shit else to me. I committed murda w/a gun, now I committed murder wit anthrax. You bitches killed me, now /'ma kill you. You can't give me any more time and you can't take away what this time took already. But I took ur niggaz life. Rest in piss bitches!!!

[2] The body of the letter to the Summit County Clerk of Courts' office read:

> You bitches took my life. You gave me 15-life in Aug 94, it's now Aug 2014, for 20 fucken years, you cowards made me sit behind these walls, now I put you niggaz left in the ground. I killed by gun, now I kill by Anthrax. Rest in piss bitches!!!

specifically through use of an anthrax letter. The writer also admitted to providing the sugar used to simulate anthrax.

Upon a search of Manns's cell, a box of "Sweet Sprinkles," a sugar substitute, was recovered, as well as a paper listing Penn's name, inmate number, and the words "11(vending card w/money ½ and ½)." When investigators interviewed Manns, he stated that he believed that Penn had stolen his AVI vending card and that he had taken down Penn's information to file a grievance against him with the warden. Manns denied sending the letters to Summit County or writing them for Penn.

The three letters—the two Anthrax letters sent to Summit County and the anonymous letter left at Marion Correctional Institution—were sent to the Ohio Bureau of Criminal Investigation for forensic handwriting testing, along with samples from both Penn and Manns. A forensic examiner determined that all three letters matched the handwriting sample provided by Manns. Penn and Manns were interviewed again in November 2014. Penn told investigators that Manns had admitted to sending the letters because he "wanted to get back at him" and told Penn that he "didn't believe it was going to become such a big deal." Manns denied telling Penn any such thing, and again denied sending the letters. He did, however, tell investigators that he had "retaliated against other inmates and corrections officers in the past for what he perceived to be injustices committed against him."

Investigative subpoenas were sent to Marion Correctional Institution for copies of emails and recorded telephone conversations by Manns for a period of time before the Anthrax letters were sent to Summit County. Emails between Manns and his fiancée, Pamela Nichols, revealed Manns's frustration and animosity towards an "old guy" in his bunk and at having his AVI vending card stolen. On August 13, 2014, a little over a week before the Anthrax letters were

received in Summit County, Manns asked Nichols to look up information about Robert Penn, including the county he was from, his charges, his sentence, and how long he had been in prison. When Manns spoke with Nichols later that same night, she provided him with the requested information. On the morning of August 22, Manns wrote to Nichols: "OH…..i took care of that guy who stole my shit. Dont worry, nothing can come bk on me, i was careful and cautious about what I did."

Manns was named in an indictment on May 6, 2015, charging him with two counts under 18 U.S.C. § 876(c) for Mailing Threatening Communications and two counts under 18 U.S.C. § 1038(a)(1) for sending False Information and Hoaxes. Manns pleaded guilty without a plea agreement.

At sentencing, Manns's attorney highlighted the impact that Manns's physical and mental conditions have had on his life. Manns was born with significant birth defects as a result of his mother's use of Accutane, an acne medication, while pregnant. In particular, Manns suffers from Fragile X Syndrome, a genetic condition that causes intellectual disability, as well as behavioral and learning challenges. Manns was also born with Goldenhar's Syndrome, a condition that caused significant physical deformities at birth, including incomplete brain development, an asymmetric head shape, and the absence of his left ear. Manns had several reconstructive surgeries as a small child and experienced delays in motor development. In addition to these challenges, Manns has been diagnosed with Bi-Polar Disorder, depression, and schizophrenia. The district court agreed with Manns's attorney that these conditions constituted a "significant cognitive deficit" that has "impaired [Manns's] ability to make good decisions."

Manns's attorney also emphasized that Manns's physical conditions and small stature have made him the target of bullying throughout his life. He stated that Penn was one such

bully, subjecting Manns to physical and emotional abuse while he was at Marion Correctional Institution. When Manns reported this abuse, the prison apparently told him that his only recourse would be to go into solitary confinement, which would cause him to lose visitation and other privileges. Instead, Manns chose "the worst path," opting to attempt to frame Penn for the Anthrax letters to induce separation between them.

Following the Pre-Sentence Investigation Report (PSR), the district court calculated Manns's total offense level to be 24, including a six level-increase based on the application of the enhancement under USSG § 3A1.2, for "Official Victims." The court reduced the total offense level to 21 based on Manns's acceptance of responsibility and timely guilty plea. The district court further reduced his total offense level by four points, pursuant to USSG §§ 5H1.3 and 5H1.4, due to Manns's mental and physical conditions. With a total offense level of 17 and a Criminal History Category of VI, the district court calculated the sentencing range under the Guidelines to be 51 to 63 months. The district court sentenced Manns to 51 months, to run consecutively to his existing sentence for state charges. Manns now appeals his sentence, arguing that the district court erred in applying the "Official Victim" enhancement.

## II.     ANALYSIS

### A.     Standard of Review

We review the reasonableness of a district court's sentence under the abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). This deferential standard involves examining both the procedural and substantive reasonableness of a sentence. *United States v. Erpenbeck*, 532 F.3d 423, 430 (6th Cir. 2008). A sentence is procedurally unreasonable when the district court has committed a "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to

consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51. "We review *de novo* a district court's application of the Sentencing Guidelines when that application involves mixed questions of law and fact. . . . [and w]e review for clear error a district court's finding of fact in connection with sentencing." *United States v. Stafford*, 721 F.3d 380, 400 (6th Cir. 2013) (quoting *United States v. Hayes*, 135 F.3d 435, 437 (6th Cir. 1998)).

The Government contends that plain error review applies to one of Manns's arguments—that the sentencing enhancement should not apply because he was not motivated by the victims' status as government employees—arguing that the objection was not preserved. "A party must object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection." *United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004) (internal quotation marks and citation omitted). *United States v. Simmons*, 587 F.3d 348 (6th Cir. 2009), explains why. An empty objection, such as "to the 'procedural . . . aspect[]' of the sentence," *id.* at 355, would limit the district court's ability to correct errors because it would penalize "a party's specificity: vague responses would guarantee that any new objection made on appeal will be subject to a less deferential standard of review and specific responses would result in the forfeiture of all other objections that were not explicitly made," *id.* at 357. Where a party fails to object or does so "at such a high degree of generality that the district court has no opportunity to correct its purported error and the court of appeals has been deprived of a more detailed record to review," plain error review will be applied on appeal. *Id.* at 358.

The *Bostic* question aims for practical specificity and Manns's objection satisfies that goal. He identified the enhancement he objected to in writing, at the sentencing hearing, and in response to the *Bostic* question; he specifically highlighted reasons he thought the enhancement

under USSG § 3A1.2 did not apply.  The district court had notice of Manns's arguments and an adequate opportunity to address them; the record is satisfactory for our review.  Manns's objection to the use of the enhancement under USSG § 3A1.2 at sentencing was sufficiently specific, and we apply de novo review to his arguments on appeal.

### B.    "Official Victim" Enhancement

Manns objects to the use of the sentencing enhancement under USSG § 3A1.2(a) and (b), which increases a defendant's total offense level by six points:

> (a) If (1) the victim was (A) a government officer or employee; . . . and (2) the offense of conviction was motivated by such status[;]

> (b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person).

Manns concedes that at least one of the victims of his offense was a government officer or employee, and that the applicable Chapter Two Guideline is from Part A.  He argues, however, that the enhancement should not apply because Manns's conduct was not motivated by the victims' status as government employees, that there was no specified individual victim, and because the victims were employees of the state, not federal, government.  We examine each argument in turn.

#### 1.    Motivation of Manns's Conduct

Manns first argues that the district court improperly applied the enhancement because his conduct was not motivated by the official status of the government employees, as required under § 3A1.2(a)(2).  Manns states that his conduct was motivated by a personal dispute with a private citizen, Penn, not the government status of the recipients.  Manns points to the explanation in the Guidelines Commentary that the subsection "means that the offense of conviction was motivated by the fact that the victim was a government officer or employee" and "would not apply, for

example, where both the defendant and victim were employed by the same government agency and the offense was motivated by a personal dispute." USSG § 3A1.2, cmt. 3.

In *United States v. Talley*, 164 F.3d 989, 1004 (6th Cir. 1999), we determined that the enhancement in § 3A1.2 was properly applied because the defendant knew that his intended victim was an FBI agent and his goal was to derail an ongoing federal investigation against him. Manns argues that his desire to get Penn in trouble and prevent any further bullying distinguishes *Talley*. But *Talley* provides support for use of the enhancement here because Manns also knew that the recipients were government employees, and his intention was to spur official action against Penn. The enhancement does not require that the defendant's conduct be motivated by personal animus against the government employee. Indeed, the Guidelines Commentary seeks to eliminate this possibility by providing that conduct motivated by a personal dispute, where the victim just happened to be a government employee, would not be covered by the enhancement. *See* USSG § 3A1.2, cmt. 3.

When addressing Manns's objection to the enhancement at the sentencing hearing, the district court stated that the "issue is not [Manns's] intent; it is the logical implications and consequences of what he does." The court highlighted the reason why Manns sent the Anthrax letters to the Summit County Prosecutor's Office and Clerk of Courts: they knew about Penn, would trace the Anthrax letter to him, "prosecute him again and get him out of [Manns's] hair." Manns specifically sent the letters to government offices that had a history with Penn, using Penn's name, to create problems for Penn. This is sufficient to show that Manns was "motivated by" the government status of the recipients.

The Ninth Circuit came to the same conclusion in *United States v. McAninch*, 994 F.2d 1380, 1386 (9th Cir. 1993), a similar case in which the defendant sent threatening letters to

President George H.W. Bush and signed the names of two men he was attempting to frame. The court rejected the defendant's contention that he was not motivated by President Bush's official status, finding that the letter "referred to the President's official duties," and "the purpose of the communication evidently was to implicate its purported author in unlawful activities that would attract the attention of the authorities." *Id.* Manns knew these specific government offices had been involved with Penn's case and he sought to attract their attention to Penn and create adverse consequences for him.

The other cases Manns cites do not change our conclusion. To the contrary, they support the application of this enhancement to Manns because he sought to cause the government offices to take official action against Penn. *See United States v. Conaway*, 713 F.3d 897, 902 (7th Cir. 2013) (applying the enhancement where the defendant intended to influence the actions of various federal agencies by using specific threats that showed he "anticipated a response from law enforcement"); *United States v. Bailey*, 961 F.2d 180, 182-83 (11th Cir. 1992) (finding that the defendant was motivated by a federal mail carrier's official status when he sought money orders and knew that a mail carrier would be in possession of them).

Manns also argues that Penn would have faced the same repercussions had Manns sent the threatening letters to private citizens. We do not share his certainty. As the Government points out, directing the letter to an "office full of government employees against whom Penn could be expected to hold a grudge" lent credence to the idea that Penn himself sent the letter, and also maximized the impact of the fake anthrax. Sending the letter and white powdered substance to a government office set off a logical chain of events leading to official consequences for Penn, including his rapid seclusion. The motivation for Manns's conduct was to punish Penn and have him removed from the prison's general population. The official status

of the government offices was an integral part of achieving this goal. We find that Manns's conduct was motivated by the official status of the government employees who received the threat.

### 2. Specified Individual Victims

Next, Manns argues that the sentencing enhancement was improperly applied because the letters were sent to government offices, not specified individuals as required by the Guidelines. Manns relies on the Guidelines Commentary, which states that the enhancement "applies when specified individuals are victims of the offense" and "does not apply when the only victim is an organization, agency, or the government." USSG § 3A1.2, cmt. 1. Manns asserts that the letters were addressed to the Summit County Prosecutor's Office and the Clerk of Courts' Office, not specified individuals. The district court rejected this argument at sentencing, determining that the letters were directed to the county prosecutor and clerk of courts, and the people employed by them. Moreover, they were received and opened by specific individuals.

A threat does not need to be directed at a named individual to meet the requirements of the official victim enhancement. *See United States v. Mattison*, 946 F.2d 896, at *3 (6th Cir. 1991) (unpublished table decision) (finding that the enhancement applied when the defendant sent a letter to the U.S. District Court for the Middle District of Tennessee threatening to kill "any United States Judge" who violated his rights, because the letter specified an "identifiable individual, i.e., that particular judge to whom the case would be assigned"). Cases from other circuits have also held that the enhancement applies when a threat sufficiently specifies its intended recipient, even if that individual is not named. *See United States v. Stover*, 165 F.3d 22, at *2 (4th Cir. 1998) (unpublished table decision) (finding that the enhancement applied where the defendant sent a letter to the county prosecutor's office threatening to have two unnamed

assistant prosecutors followed and beaten, because the letter sufficiently focused on the two prosecutors who had prosecuted the defendant); *United States v. Polk*, 118 F.3d 286, 298 n.10 (5th Cir. 1997) (declining to read "specified individuals" to require government employees to be named in a threat, and applying the enhancement where the record showed that the defendant "intended to kill or injure federal employees who work in the IRS Center in Austin") *abrogated on other grounds by Abramski v. United States*, 134 S. Ct. 2259, 2273-74 (2014).

Manns sent the letters to the Summit County Prosecutor's Office and Clerk of Courts' Office. The letters themselves referred to "you bitches" and "you cowards," stated that "you" gave Penn 15 years to life, and threatened to kill those who "killed" Penn and "made [him] sit behind [prison] walls." This presumably refers to the employees who were involved in Penn's case, and as the Government notes, are not rants against the government or criminal justice system in general. The letters referenced harm and violence towards the individuals within the prosecutor's and clerk of courts' offices that were involved in Penn's case, as well as the rest of the employees in the vicinity of the so-called anthrax. This is sufficiently specific to implicate the use of the enhancement.

The case Manns primarily relies on in support of his interpretation, *United States v. Schroeder*, 902 F.2d 1469, 1471 (10th Cir. 1990), is inapposite. In *Schroeder*, the defendant, while on the phone with an Assistant United States Attorney, "stated that it would be easy to get a gun and walk into a post office and start shooting." *Id.* at 1470. The Tenth Circuit determined that the enhancement under § 3A1.2 did not apply because the Assistant U.S. Attorney had not received a threat to his person, and that "to find an official victim for purposes of sentencing . . . the victim must be one who is the object of a threat under these facts." *Id.* at 1471. The object of the threat was the post office; the U.S. Attorney was merely its recipient. *Id.* Manns

analyzes these facts to his case, alleging that the individuals within the county offices that received the anthrax letters were only recipients. But the employees at the Summit County Prosecutor's Office and Clerk of Courts' Office were *also* the objects of the threat. The letters communicated violence toward the employees within the offices with sufficient specificity. Application of the enhancement was appropriate.

### 3. State Government Employees

Finally, Manns argues that § 3A1.2 only applies to employees of the federal government, not state and local government employees like those working in the Summit County Prosecutor's Office or Clerk of Courts' Office. He acknowledges that a previous version of the Guidelines explicitly stated that the enhancement applies to victims covered under 18 U.S.C. § 1114 (which makes specific reference to federal employees) and that version was subsequently changed to encompass more federal employees. Manns argues that while the Guidelines now cover a broader range of federal employees, the language of the enhancement is not broad enough to cover state employees.

Our precedent establishes that § 3A1.2(a) applies equally to state and local government employees, including county government employees. *See United States v. Hudspeth*, 208 F.3d 537, 539-40 (6th Cir. 2000) (holding that "federal criminal sentences may be enhanced pursuant to § 3A1.2(a) if the underlying conduct was motivated by the victim's status as a state or local government employee"). The district court properly applied the enhancement in this case.

### III. CONCLUSION

For the reasons explained above, we AFFIRM Manns's sentence.