# United States Court of Appeals
## For the First Circuit

No. 18-1774

UNITED STATES OF AMERICA,

Appellee,

v.

ORLANDO DÁVILA-BONILLA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Torruella, Dyk,[*] and Thompson,
Circuit Judges.

Jessica E. Earl, Assistant Federal Public Defender, with whom Eric Alexander Vos, Federal Public Defender, and Vivianne M. Marrero, Assistant Public Defender, Supervisor, Appeals Section, were on brief, for appellant.

Jonathan L. Gottfried, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and Thomas F. Klumper, Assistant United States Attorney, Senior Appellate Counsel, were on brief, for appellee.

---

[*] Of the Federal Circuit, sitting by designation.

July 29, 2020

**THOMPSON, <u>Circuit Judge</u>.**

**Preface**

Orlando Dávila-Bonilla ("Dávila") is no stranger to the criminal justice system, as his record of drug-law and supervised-release violations shows. During his most recent supervised-release stint, Dávila got federally indicted on two crimes — Count One essentially accused him of intimidating or interfering with U.S. probation officers, <u>see</u> 18 U.S.C. § 111(a)(1), and Count Two basically accused him of influencing U.S. probation officers by threat, <u>see</u> <u>id.</u> § 115(a)(1)(B). He pled guilty to both charges without a plea agreement. And, as relevant here, Judge Besosa sentenced him to concurrent prison terms of 12 months on Count One and 48 months on Count Two.

Before us, Dávila complains that his 48-month sentence is both procedurally and substantively unreasonable. Convinced that it is neither, we affirm.

**How the Case Came to Us**

We draw the background information from the materials on appeal, particularly the uncontested parts of the probation office's presentence report and the transcripts of the important court hearings. <u>See, e.g.</u>, <u>United States</u> v. <u>Barrios-Miranda</u>, 919 F.3d 76, 77 n.1 (1st Cir. 2019).

After doing time in prison for violating federal drug laws, Dávila began an eight year term of supervised release.[1]  But he later violated a condition of his release by (among other things) using controlled substances.  So Judge Fusté (who had imposed the original sentence) revoked Dávila's release and sentenced him to 4 months in prison followed by 48 months of supervised release.

Eventually back on supervised release, Dávila had two different probation officers in charge of his case — first Gabriel Feliciano and then Mariela Fernández.  After replacing Feliciano, Fernández one day got a text from Dávila saying that he had received an automated message telling him to report to probation for mandatory testing — but he thought that was a mistake.  Within minutes, Fernández called him up to say that he had in fact been randomly selected to provide a urine sample.  An upset Dávila

---

[1] As a side note, Congress years ago replaced parole in federal sentencing with supervised release.  See United States v. O'Neil, 11 F.3d 292, 298 (1st Cir. 1993); see also Pub. L. No. 98-473, 98 Stat. 2177 (1984).  Both parole and supervised release involve restrictions on persons once they get out of prison.  But parole restrictions

> end when the term of imprisonment to which the defendant was sentenced ends; so if he was sentenced to five years in prison and released on parole after three years, the restrictions that parole imposes on him expire after two years.  A term of supervised release is specified separately in the sentence; it is not a function of the prison term imposed by the sentence.

United States v. Williams, 739 F.3d 1064, 1065 (7th Cir. 2014) (Posner, J.).

responded that he had given a sample the day before and now had no way to get back to probation. Fernández asked to speak with Dávila's mother, whom he lived with at the time. Dávila put his mother on the phone. But he quickly took the phone back and "threaten[ed] and insult[ed]" Fernández, calling her a "fucking bitch," accusing her of "trying to fuck" with him and of wanting him to "fail," and saying he would "make a scene" if he had to return to probation so soon (spoiler warning: he kept his promise, as we shall shortly see). He continued slinging insults at her until she finally hung up.

Dávila then called Orlando Rullán, a supervisory probation officer, to complain about Fernández. After this call, Dávila phoned Fernández to apologize. But he started complaining about her again, telling her that he would rather go to prison than have her as a supervisor. And he said that if he had to go to probation today, he would simply "surrender" to federal marshals.

Later that day, Dávila did go to probation. Once there, he began acting "erratic[ally]" and "aggressive[ly]." Hoping to diffuse the situation, Alejandro Martínez, a probation officer assigned as the duty officer, took Dávila from the office's waiting room to the laboratory area. Dávila told Martínez that if he saw Fernández he would "beat [her] up." Continuing to call her a "fucking bitch," Dávila also "bragg[ed]" about his prior domestic

violence offenses and about beating a woman with a fire extinguisher."

While Martínez was trying to calm Dávila down, Rullán got a call from the office's receptionist saying Dávila was "agitated and aggressively arguing" with probation personnel. Arriving at the scene, Rullán heard Dávila claim that he would "beat" Fernández if he saw her. And he then heard Dávila "brag[]" about "his multiple domestic violence convictions," how "he loved beating women," and that "he enjoyed being in jail where he could sexual[ly] assault other inmates." An unnamed probation employee also heard Dávila blame Fernández "for his trip to the office," say he would "take her down" if he saw her, and "brag[] about his history of domestic violence" and how "he enjoyed hitting women and was not afraid to do it again."

Rullán took Dávila to his office. Concerned that Dávila might become violent, Martínez made sure the office door stayed open and hung around while Rullán and Dávila talked. Still "agitated," Dávila said he had "had it" with Fernández and "was going to harm someone." Pointing at Rullán, Dávila also said that "[i]f you mess with me I will mess with you more."[2] Convinced that

_____

[2] At a hearing in this case, the government stated that the literal translation of what Dávila said was "[i]f you fuck with me, I will fuck with you more."

- 6 -

"an assault was imminent," Martínez had the receptionist call the marshals — who arrived and arrested Dávila.

A 14-year veteran of the probation department, Rullán called his interaction with Dávila "the most aggressive and threatening confrontation" he had ever experienced. And Martínez said he had "never seen behavior this bad" in his 12 years with the department.

A federal grand jury later indicted Dávila on two charges. Count One alleged that he "knowingly did forcibly resist, oppose, impede, intimidate or interfere with officers of the United States Probation Office . . . while they were engaged in, or on account of the performance of, their official duties." See 18 U.S.C. § 111(a)(1). And Count Two alleged that he "knowingly did threaten to assault officers of the United States Probation Office . . . with the intent to impede, intimidate and interfere with, and to retaliate against, those officers while they were engaged in their official duties." See 18 U.S.C. § 115(a)(1)(B).

Represented by counsel, Dávila ultimately pled guilty to both counts without a plea deal. At the change-of-plea hearing, Judge Besosa read the indictment and got Dávila's acknowledgment (among others) that he had committed both crimes. By the hearing's end, the judge accepted his plea.

Acting on Dávila's motion, Judge Besosa ordered that "an experienced probation officer from [another] probation office in

one of the districts in First Circuit" draft a presence report

(the purpose of which was to aid the judge in sentencing).[3] And a

probation officer in the District of Massachusetts did just that.

Here is an overview of her sentencing math.[4]

- After setting out the facts as just described (and using the
  2016 version of the guidelines), she estimated Dávila's total

---

[3] Dávila's motion argued that the victims of the crimes are probation officers in the district, leading to "an apparent conflict of interest" and "the appearance of impropriety" if a local probation officer prepared the report. He filed a separate motion for a change of venue, raising similar concerns. Judge Besosa denied the venue-change request, however. Dávila challenged the venue-change denial in his appellate papers but waived that issue at oral argument — so no more need be said on that subject.

[4] For those new to this area, Congress enacted sentencing guidelines that set up formulas for creating sentencing ranges — which, while not mandatory, are highly influential:

> Sentencing under the . . . guidelines starts with the base offense level — *i.e.*, a point score for a specified offense or group of offenses. The guidelines then make adjustments for any aggravating or mitigating factors in the defendant's case, thus arriving at a total offense level. The guidelines also assign points based on the defendant's criminal history — points that get converted into various criminal history categories, designated by Roman numerals I through VI. Armed with this info, the judge turns to the guidelines's sentencing table. And by plotting the defendant's total offense level along the table's vertical axis and his criminal history category along the table's horizontal axis, the judge ends up with an advisory prison range. From there, the judge sees if any departures are called for, considers various sentencing factors, and determines what sentence (whether within, above, or below the suggested range) seems appropriate.

United States v. Martínez-Benítez, 914 F.3d 1, 2 n.2 (1st Cir. 2019) (citations omitted).

offense level at 17.  This accounted for a base offense level of 12, see USSG § 2A6.1(a)(1); a couple of enhancements worth 8 levels — including a 6-level increase because the offense was motived by the victim's being "a government officer," see id. § 3A1.2(a) and (b);[5] and a 3-level mark down for timely acceptance of responsibility, see id. § 3E1.1(a), (b).

- She pegged Dávila's criminal history category at III — although she listed four dismissed local charges from about ten years earlier, including three for domestic abuse, she did not factor them into the calculation (the significance of these charges will become clear later).

- And with a total offense level of 17 and a criminal history category of III, Dávila faced an advisory imprisonment range of 30 to 37 months — or so she wrote.

Dávila filed objections to the presentence report (the government did not).  Relevantly, he contested the 6-level enhancement on the ground that application note 2 of the commentary to § 2A6.1(a)(1) says § 3A1.2(b) applies when a defendant is convicted under 18 U.S.C. § 1521, which basically criminalizes the filing or attempted filing of a false lien or encumbrance to

---

[5] The government bears the burden of proving sentencing enhancements by a preponderance of the evidence, see United States v. Ilarraza, 963 F.3d 1, 8 (1st Cir. 2020) — which is a "more likely true than not" rule, see United States v. Marino, 833 F.3d 1, 8 (1st Cir. 2016).

retaliate against a federal officer or employee — a statute different from the one he pled guilty to: 18 U.S.C. § 115. And he challenged the enhancement on the further ground that he has "problems involving lack of respect towards others, not limited to only government employees" — so (his argument continued) his "threatening words" were not "motivated by th[e] person's status as a probation officer."

Both Dávila and the government submitted sentencing memos. It is enough for current purposes to say that Dávila's document spotlighted his mental-health challenges, history of drug abuse, and lack of family support (among other difficulties). He requested a bottom-of-the-range prison sentence, while the government requested a top-of-the-range one.

In the midst of all this, Dávila faced (in a different courtroom) revocation of the supervised release he received in his drug case. He did not challenge the new allegations against him. And Judge Cerezo (who took over that case after Judge Fusté retired) revoked his release as punishment for the violation and sentenced him to 18 months in prison, to run consecutively to any time imposed in the case before Judge Besosa.

Two days before the sentencing hearing here, Judge Besosa (apparently on his own initiative) continued the matter "[b]ecause the translations of the documents pertaining to [Dávila's] prior criminal offenses [were] not ready." The

government later submitted certified translations of various charging documents from several criminal cases filed against Dávila in a Puerto Rico local court. And of those cases, three are noteworthy here (again, for reasons that will soon become apparent).

The first involved a criminal complaint — "based on [p]robable [c]ause" and signed by a prosecutor — that accused Dávila of punching the mother of one of his sons and then tightening a chain around her neck, all while screaming "[s]kank, you are worthless." The second involved a criminal complaint — also "based on [p]robable [c]ause" and signed by a prosecutor — that accused Dávila of hitting the same woman in the face, grabbing her hair, spitting on her, and calling her a "whore." And the third involved a criminal complaint — likewise "based on [p]robable [c]ause" and signed by a prosecutor — that accused Dávila of assaulting another woman with a pipe.[6] The presentence report mentioned the first two incidents. Anyway, the Puerto Rico local court dismissed each case for violations of Dávila's right to a speedy trial. See P.R. Laws Ann. tit. 34, Ap. II, § 64(n).

---

[6] The first two complaints say they were "based on Probable Cause pursuant to Rule 23 of Criminal Procedure" — a rule that discusses probable-cause determinations by "magistrate[s]." See P.R. Laws Ann. tit. 34, Ap. II, § 23 (providing that a person charged with a felony has a right to a preliminary hearing where a magistrate decides whether probable cause exists to believe the person committed the charged crime). The third complaint says it was "based on Probable Cause determined by a magistrate."

- 11 -

A lot happened at the sentencing hearing. But again, we emphasize only those events most relevant to this appeal.

Judge Besosa made clear that he had reviewed the parties' sentencing memos. And he gave both sides a final chance to make their sentencing pitch. Arguing first, Dávila's lawyer again challenged application of the official-victim enhancement, USSG § 3A1.2(b). As defense counsel saw it, Dávila's actions were not "motivated by the status of the probation officer['s] being a [g]overnment officer." But that argument went nowhere. "[I]t's obvious that he threatened Ms. Fernández and Mr. Rullán because they are probation officers," Judge Besosa said in rejecting the challenge — to which defense counsel responded: "Understood, Your Honor."

Dávila's attorney then asked Judge Besosa to sentence his client "to the lower end of the guidelines." To justify the request, counsel talked about Dávila's "difficult" childhood, how his "common-law wife" would "spit in his face" when "she was upset with him," his "bipolar" diagnosis, and his long struggle with drug addiction. And counsel acknowledged that Dávila's "interactions" with his "girlfriend" show he still "has to learn things that he never learned before as to how to ad[a]pt to basic social norms." And counsel suggested that this was why Dávila had "an outburst over the phone with Probation Officer Fernández" and "again had an outburst" at the probation office. But counsel also

- 12 -

blamed Dávila's "aggressive" behavior on "the effects of synthetic marijuana."

Judge Besosa asked defense counsel why, if synthetic marijuana was to blame, did Dávila not have an outburst the day before when he went to probation for the first urine test. To the judge, it seemed that Dávila threatened the probation officers because "he was upset . . . he was called in the second day." Answering, Dávila's attorney said "[o]ne of the issues with synthetic marijuana is the lack of predictability" when it comes to "outburst[s]." The judge did not buy that response. Nor did he buy the bipolar argument that Dávila "was low the day before and high the next day."

The government argued against the defense's lower-end-of-the-guidelines request, stressing how Dávila had called Fernández a "fucking bitch," conceded "he enjoyed beating up women," and boasted about his "multiple domestic violence cases." Adamant that the guidelines here failed to "take into account the gender motivated nature of this offense," the government insisted that Dávila could not "control himself" despite probation's and the court's best efforts to address his drug and mental-health concerns (the prosecutor noted that the government had referred him to programs to help him with those issues). All of which, according to the government, underscored the need for Dávila to get "an upper guideline[s] sentence."

Judge Besosa turned back to Dávila's lawyer for a response. Counsel said that perhaps this was "not the best time" for Dávila to have a woman probation officer given his possible "prejudice." But the judge pointed out that Dávila "admitted that he enjoyed beating up women, and I have here three examples." The judge then referenced the docket numbers for the three dismissed domestic-violence cases. Defense counsel wanted "the record to reflect that [Dávila] was not convicted for any of those cases." "I know he wasn't," the judge said, "but he admitted that he enjoyed beating up on women, and these are three examples." Adding that the cases were all "based on probable cause," the judge said that he could take this "conduct . . . into consideration."

Unconvinced, defense counsel argued that Judge Besosa could "only use" the documents as proof that Dávila "was charged with those [crimes] and that the [crimes] were dismissed." But the judge said, "[R]emember what probable cause is. That a crime was committed, and that he committed it."

Dávila then spoke directly to Judge Besosa (in legalese, Dávila "allocuted"). See Fed. R. Crim. P. 32(i)(4)(A)(ii). Apologizing for his actions and begging the probation officers' forgiveness, he claimed that he was "undergoing a bad moment" at the time and "was failing again with the use of synthetic marijuana." He also said that just because he said something while

- 14 -

"mad" did not mean that he "would go through with it." And he asked the judge to assign him a "friendlier" probation officer.

Judge Besosa indicated that he agreed with the presentence report's guidelines calculations, which (recall) resulted in an advisory prison range of 30 to 37 months. He then said that he had considered the statutory sentencing factors in 18 U.S.C. § 3553(a) (factors that guide a sentencer's sentencing discretion), the lawyers' sentencing memos and in-court arguments, and Dávila's in-court statement. He also noted aspects of Dávila's background, including his history of drug use. And he discussed the nature of the crimes to which Dávila pled guilty, focusing on how he (Dávila) had called Fernández a "fucking bitch" and had showed "erratic and aggressive behavior" at the probation office by (among other things) threatening to "beat [Fernández] up" if "he saw her," boasting "about his prior domestic violence offenses," and trying "to intimidate" Fernández and Rullán, "and perhaps the entire probation office." After detailing some of the facts of the dismissed domestic-violence cases, the judge commented how in this case Dávila had said that he would "take [Fernández] down," that he had a "history of domestic violence," and that he liked "hitting women and was not afraid to do so again." Convinced that only an above-guidelines sentence would account for the seriousness of Dávila's offense, deter him and others from similar criminal conduct, and protect the community,

- 15 -

the judge gave him a 60-month prison sentence — consisting of 12 months on Count One and 48 months on Count Two, to run concurrent with each other and consecutive to the 18-month revocation-prison sentence Judge Cerezo imposed.  See generally USSG § 5G1.3(d) cmt. 4(c) ("recommend[ing] that the sentence for the instant offense be imposed consecutively to the sentence imposed for the revocation").

Objecting, Dávila's lawyer called the sentence "substanti[ve]ly and procedurally unreasonable . . . and . . . based on non-reliable information" — namely, the dismissed local-court complaints.  This timely appeal followed.

## Arguments and Analysis

*Parties' Positions on Appeal*

We briefly summarize each side's arguments.

Dávila thinks Judge Besosa procedurally erred first by relying on the dismissed local charges, because (he writes) "the allegations contained in the complaint[s] are just that: allegations"; and second by applying the official-victim enhancement, because (he insists) the judge did not "adequately consider the arguments" against the enhancement's "applicability." He also thinks the judge substantively erred by giving him 48 months on Count Two, because (he claims) that sentence is overly harsh under a proper view of the "mitigating factors."

The government takes a diametrically opposite view of things. Among other arguments, the government contends that Judge Besosa rightly considered the dismissed local charges, because (it writes) "Dávila's confession to the probation officers that he had committed domestic violence offenses and loved to beat or hit women" infused the charges with sufficient "reliability." The government also sees no problem with the judge's application of the official-victim enhancement, because (in its words) the record amply demonstrates "that Dávila's offense was motivated by the victims' status as probation officers." And the government last claims that the 48-month term on Count Two is substantively reasonable, because (in its telling) the judge "offered a plausible and defensible [sentencing] rationale."

After setting out the standard of review, we address Dávila's arguments — bringing additional specificity to the factual background as needed to resolve each claim.

*Standard of Review*

We analyze preserved objections to a sentence's procedural and substantive reasonableness under the deferential abuse-of-discretion standard. See, e.g., United States v. Rivera-Morales, 961 F.3d 1, 15 (1st Cir. 2020). Within this standard, we review issues of law de novo and findings of fact for clear error. See United States v. Bater, 594 F.3d 51, 54 n.1 (1st Cir. 2010); see also Rivera-Morales, 961 F.3d at 15. We organize our thoughts

- 17 -

as follows:  first we see if "the sentence is procedurally reasonable (that is, free from non-harmless procedural error)" and then we see if "it is substantively reasonable." See United States v. Nuñez, 840 F.3d 1, 4 (1st Cir. 2016).

*Procedural-Unreasonableness Claims*

Dávila's first procedural-reasonableness challenge is his most serious one.  Citing United States v. Marrero-Pérez, 914 F.3d 20 (1st Cir. 2019), he insists that Judge Besosa "inappropriately considered [the] dismissed local charges" in fashioning his prison sentence.  See generally United States v. Díaz-Rivera, 957 F.3d 20, 26 (1st Cir. 2020) (calling a similar challenge a procedural-reasonableness attack).  Clarifying his position, Dávila writes that he "does not suggest that a district court can *never* consider sworn criminal complaints in making sentencing decisions."  He just thinks (emphasis ours) that "even under the preponderant proof standard," a district judge's "reliance on dismissed state court conduct, based on a one-sided criminal complaint, *without more*, is impermissible to justify the upward variance imposed here."  And he believes the transcript shows (to quote his reply brief) that Judge Besosa thought the local magistrate's probable-cause findings concerning the complaints "meant . . . Dávila must have committed the conduct alleged therein."

- 18 -

Marrero-Pérez forcefully and emphatically held that "no weight should be given in sentencing to arrests not buttressed by convictions or independent proof of conduct," see 914 F.3d at 22 — so, for example, a district judge errs by "rel[ying] on an arrest report, without *some greater indicia of reliability* that the conduct underlying the arrest took place," id. at 24 (emphasis added). We implore the bench and bar in this circuit to be ever mindful of those words — and not for the first time, for "we've repeatedly cautioned" judges and lawyers alike "against relying on mere charges to 'infer unlawful behavior unless there is proof by a preponderance of the evidence of the conduct initiating [those] arrests and charges.'" See United States v. Colón-Maldonado, 953 F.3d 1, 9 (1st Cir. 2020) (quoting United States v. Rondón-García, 886 F.3d 14, 25-26 (1st Cir. 2018)).[7]

---

[7] The government spends some energy making an argument that runs like this: (a) Marrero-Pérez involved an upward departure under USSG § 4A1.3, not an upward variance under 18 U.S.C. § 3553(a) — and § 4A1.3(a)(3) says that "[a] prior arrest record itself shall not be considered for purposes of an upward departure under this policy statement." See generally United States v. Miranda-Díaz, 942 F.3d 33, 40 (1st Cir. 2019) (explaining the difference between a departure and a variance). (b) Judge Besosa imposed an upward variance. (c) Ergo (to quote the government's brief) "Marrero-Pérez does not apply."

Without "squarely deciding" the point, a few cases have intimated "that Marrero-Pérez does not make it plain error to rely on bare arrest reports to impose an upward variance," though other cases have "questioned whether the 'departure-variance distinction' would hold up '[i]f some future case turned on it'" — the thought being "that Marrero-Pérez 'rest[s] on [the] basic principle' that 'a bare arrest or charge does not prove the defendant committed the crime.'" See Díaz-Rivera, 957 F.3d at 26

- 19 -

The words in Marrero-Pérez that we italicized for emphasis — "some greater indicia of reliability" — are the key to our evaluation of Dávila's case, as we now explain.

Dávila criticizes Judge Besosa for telling defense counsel, "[R]emember what probable cause is.  That a crime was committed, and that he committed it."  Defending the judge's remarks to the hilt, the government argues that unlike arrests reports, which police generate for investigatory purposes, a magistrate's probable-cause finding — that the defendant committed the charged crime — in and of itself provides the requisite reliability.  But we fail to see how that view can prevail, given our recent statement (in a related context) that "a district court may *not* rely on another (federal or state) judge's probable cause determination to find that the government's proof met the higher 'preponderance' standard."  Colón-Maldonado, 953 F.3d at 13 (emphasis added); see also id. n.11.

Still, however, we find that Judge Besosa's probable-cause comments were at worst harmless error.  And that is because, as the government also argues, Dávila's own admissions about his history of domestic abuse provide the required reliability indicators.  As reflected in the undisputed parts of the

(discussing and quoting Colón-Maldonado, 953 at 9 n.8).  But following Díaz-Rivera's lead, we assume — favorably to Dávila — "that Marrero-Pérez applies both in the upward variance and departure contexts."  See 957 F.3d at 26.

presentence report, Dávila copped to having committed "prior domestic violence offenses" and to beating "a woman with a fire extinguisher"; to having "enjoyed hitting women"; and to his "not [being] afraid to do it again" — something the judge mentioned in his sentencing analysis.  Sentencers have "'wide discretion to decide whether particular evidence is sufficiently reliable to be used at sentencing'" — evidence that "includes information contained in a presentence report."  Rodríguez-Reyes, 925 F.3d at 563-64 (quoting United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010)).  And under controlling precedent, Dávila's unobjected-to admissions to the preparer's report "provide[] 'some greater indicia of reliability'" that the actions triggering the arrests occurred.  See id. at 565 (quoting Marrero-Pérez, 914 F.3d at 24).  Which takes all the wind out of his first procedural-reasonableness challenge.

Dávila's second procedural-reasonableness challenge attacks Judge Besosa's use of the official-victim enhancement under USSG § 3A1.2(b).  That enhancement (recall) applies if the victim was "a government officer or employee" and the offense "was motivated by such status."  See USSG § 3A1.2(a)-(b).

Dávila concedes that a probation officer "qualifies as a government employee" — he just thinks "the facts of the case do not indicate that [his] threatening words against a [probation officer] were motivated by that person's status as a probation

officer."  What he overlooks is that the official-victim enhancement "is designed to protect government officers in the performance of their official duties."  United States v. Watts, 798 F.3d 650, 655 (7th Cir. 2015) (Posner, J.).  And the record shows that Dávila threatened the probation officers because of the actions they took in their official role — *e.g.*, because they insisted that he take the random drug test.  He also expressly agreed during the change-of-plea hearing that he had "knowingly threatened to assault [probation] officers . . . with the intent to impede, intimidate, interfere with, and to retaliate against those officers while they were engaged in their official duties." In other words, he himself admitted that the threats were motivated by the officers' being government employees.  So we cannot say Judge Besosa clearly erred in finding Dávila's offense was motivated by their status as "government officers or employees." See generally Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 46 (1st Cir. 2013) (explaining that clear error means the judge's finding was "wrong with the force of a 5 week old, unrefrigerated, dead fish" (quoting S Indus., Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001))).

Dávila next notes that the commentary to § 2A6.1 — the section that sets the base offense level for crimes involving threatening or harassing communications — says that judges should add the official-victim enhancement "if the defendant is convicted

under 18 U.S.C. § 1521," a provision (remember) that he did not violate.  See USSG § 2A6.1, cmt. 2.  Using this as a springboard, he argues that if the "intent" of the guidelines' drafters "was to contemplate additional 'official victim adjustments' for other charges," they would have "included" those statutes "in the application note."

The guidelines, however, are pretty clear when they want to exclude application of a particular enhancement.  See United States v. McCarty, 475 F.3d 39, 46 (1st Cir. 2007).  The commentaries to USSG § 2A2.4 (pertaining to instructing or impeding an officer) and § 2H3.1 (relating to eavesdropping or interception of communications) specifically exclude application of § 3A1.2.  See USSG § 2A2.4, cmt. 2; USSG § 2H3.1, cmt. 3.  Not so the with commentaries to § 2A6.1.

Also, the sentencing commission (the agency that issues and updates the guidelines) amended § 2A6.1's commentary to make clear that the § 3A1.2 enhancement applies if the defendant violates 18 U.S.C. § 1512.  See United States v. Nickerson, 782 F. App'x 377, 382 (6th Cir. 2019) (discussing USSG suppl. to app. C at 288-89, amend. 718, reason for amend. (2008)).  But the amendment does not suggest that the enhancement applies *only* when the defendant violates § 1512.  See id.  And a quick Westlaw search turns up circuit-level cases issued *after* the amendment that applied the enhancement to threat offenses other than § 1512, see,

- 23 -

e.g., id. at 378, 382; United States v. Manns, 690 F. App'x 347, 350, 354 (6th Cir. 2017); United States v. Conway, 713 F.3d 897, 899, 903 (7th Cir. 2013) — a point the government made in its brief and Dávila left uncontradicted in his reply brief.[8]

*Substantive-Unreasonableness Claim*

Having found no reversible procedural defect, we turn to Dávila's substantive-unreasonableness challenge — *i.e.*, that in giving him a 48-month term on Count Two, consecutive to the 18-month revocation sentence, Judge Besosa did not "adequately consider the arguments" the defense made in support of a lower sentence. We note that the 48-month term fell significantly below the 72-month statutory maximum for that offense. See 18 U.S.C. § 115(b)(4). Ultimately what Dávila has is an "uphill" fight, for "there is no single 'reasonable' sentence in any one case but rather a range of sensible outcomes," see United States v. Vixamar, 679 F.3d 22, 29 (1st Cir. 2012) (quoting United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011)) — and if the judge "gave a

---

[8] One final matter before we leave procedural reasonableness. Dávila writes (comma omitted) that "the relevant guideline for the base-offense level for a charge under 18 U.S.C. § 115 already contemplates the relevant enhancements to be included for said charge if the victim is an official employee." His suggestion is essentially a double-counting claim. See generally United States v. Zapata, 1 F.3d 46, 47 (1st Cir. 1993) (observing that in the criminal "sentencing context, double counting is a phenomenon that is less sinister than the name implies" and "is often perfectly proper"). But by raising the issue only in passing without developing it in any meaningful way, Dávila has waived it. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

- 24 -

plausible explanation" for the selected sentence and "reached a defensible result," a substantive-unreasonableness challenge cannot succeed, see United States v. Chisholm, 940 F.3d 119, 132 (1st Cir. 2019).

Despite what Dávila argues, Judge Besosa did consider the mitigating factors he highlights in his brief — involving his drug addictions, mental health, and upbringing. After all, the judge had read the defense's sentencing memo and had heard the defense's leniency plea (through counsel's in-court arguments and Dávila's in-court statement) — all of which put his mitigation theory front and center. See United States v. Garay-Sierra, 832 F.3d 64, 68 (1st Cir. 2016) (explaining that we can infer that the district judge considered a defendant's sentencing claims by comparing what the parties argued and what was in the presentence report with what the judge did). That Judge Besosa decided "not to attach to certain of the mitigating factors the significance that [Dávila] thinks they deserved does not make the sentence unreasonable." See Clogston, 662 F.3d at 593. The bottom line is that nothing Dávila says persuades us that the challenged sentence is implausible or indefensible.

## Final Words

All that is left to say is: *affirmed*.