# United States Court of Appeals
## For the First Circuit

No. 18-1640

UNITED STATES OF AMERICA,

Appellee,

v.

BYRON MONTIJO-MAYSONET,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Thompson, Circuit Judges.

Jessica E. Earl, Assistant Federal Defender, with whom Eric Alexander Vos, Federal Public Defender, and Vivianne M. Marrero, Assistant Federal Defender, Supervisor, Appeals Section, were on brief, for appellant.
Julia M. Meconiates, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

September 1, 2020

**THOMPSON, <u>Circuit Judge</u>.**[1]   When he was twenty-eight, Byron Montijo-Maysonet drove three middle schoolers to a motel so he and his pal could have sex with them.   That's called sexual assault, <u>see</u> P.R. Laws Ann. tit. 33, § 5191(a), and federal statutes make it a crime to "entice" or "induce" it over the Internet or "transport" a minor within Puerto Rico to commit it. <u>See</u> 18 U.S.C. §§ 2422(b), 2423(a); <u>see</u> <u>United States</u> v. <u>Cotto-Flores</u>, No. 18-2013, 2020 WL 4582283, at *9 (1st Cir. Aug. 10, 2020).   Montijo now asks us to flip his convictions and sixteen-and-a-half-year sentence.   Seeing no reversible error, we affirm.

## HOW THE CASE GOT HERE

### The Two "Vueltas"

It all started in November 2015, when Montijo's cohort, Luis Meléndez (a/k/a "Puky"), met CAP (his cousin's daughter) at a family birthday party.[2] She had just turned fourteen and started eighth grade at Marchand Middle School, a school for seventh to ninth graders in Manatí, Puerto Rico.   The two struck up a chat and, before they left, exchanged contact info so Meléndez could write to CAP on KIK, an instant messaging app.   A few days later,

---

[1] Judge Torruella concurs in this opinion subject to what he stated in his separate opinion in <u>United States</u> v. <u>Cotto-Flores</u>, No. 18-2013, 2020 WL 4582283, at *21–23 (1st Cir. Aug. 10, 2020).

[2] Given Montijo's many sufficiency challenges, "we rehearse the facts in the light most favorable to the [guilty] verdict," so far as the evidence may be reasonably construed to support it. <u>United States</u> v. <u>Dwinells</u>, 508 F.3d 63, 65 (1st Cir. 2007).

Meléndez messaged CAP and they made plans to meet again, this time without her family knowing. In the meantime, Meléndez found CAP's friend DPP on Facebook and looped her into a group chat. DPP was thirteen years old and also in eighth grade. On a Friday, Meléndez, CAP, and DPP used KIK to plan to meet the following Monday (November 24, 2015) at the middle school and drive to a motel.

As planned, when they got to school on Monday, CAP and DPP walked to a nearby food truck, where Meléndez and Montijo were waiting. They weren't in their school uniforms, Montijo stresses. Before that day, neither girl had spoken to Montijo. Meléndez introduced himself to DPP, said Montijo was his "friend," and told her they "were going to go for a ride."

Montijo drove. First, they stopped at a housing project, where the men asked the children if they "wanted to smoke or drink anything." Then, Montijo drove to a motel called "El Jackeline," a secluded joint tucked away on a long road off of Route 2 and surrounded by a hedge and a concrete wall. The motel didn't charge an overnight rate. Instead, guests could pay twenty dollars to use a room for six hours. To rent a room, you pull into a garage next to a cabana, put the money in a drawer, and enter the room. An employee looks through a peephole at the gate to see the car's license plate number and record the plate number, the room number, and the time of arrival — all without seeing the guests. The motel

- 3 -

room itself (at least the one Montijo used) is a 200-square-foot unit with two plastic chairs, a bathroom, and a double bed surrounded by mirrors. The whole set up (the motel's owner later testified) is designed to ensure guests' "privacy."

Once they got there, things happened "fast," DPP testified. Montijo and Meléndez rented two cabanas, and Montijo pulled the car into a garage next to one of them. Meléndez and CAP went into one room, and Montijo and DPP went into another. Once in the bedroom, Montijo "quickly told me that I didn't have to do anything I didn't want to," DPP later recounted. They sat down on the bed and Montijo told her that "he liked [her] hair, [her] eyes." In the other room, Meléndez had sex with CAP. Then, CAP and Meléndez called DPP to tell them they'd "finished," and they all met back at the car.

Montijo drove the girls back to the school. Once they got there, Montijo and Meléndez made sure to stay out of sight. Instead of driving DPP and CAP to the school's front door, the men dropped them off one street away — according to CAP and DPP, so "the teachers and people from the school" wouldn't see the defendants. After that, CAP never spoke to Meléndez or Montijo again.

But over the next week, Montijo used KIK to keep in touch with DPP. At trial, DPP testified that they "didn't talk about anything specific. It was just that [Montijo] wanted to see [her]

- 4 -

again." Soon, another "group [chat] was formed," this time among Meléndez, Montijo, and DPP. "[O]nce [the chat] was opened, the first thing" Meléndez said was that DPP should "bring in [an]other person." In context, DPP took this to mean "another girl." So she added her friend KVM to the group chat. KVM was also thirteen and in eighth grade. With KVM added, Meléndez, Montijo, and DPP all said they "wanted to do another outing," meaning another "ride." They used the word "vuelta" in Spanish (the same word they'd used before). And they planned to "meet in the same way" as last time: Montijo and Meléndez would pick the girls up at the food truck and drive them back to the motel.

So, on November 30, 2015 (six days after the first outing), Montijo and Meléndez took DPP on another drive, this time with KVM. That morning, after DPP's mother dropped her off at school, she and KVM met Montijo and Meléndez at the same food truck. They were both in school uniform, and DPP had her schoolbag. After Meléndez "introduced himself to [KVM]," Montijo drove them once more to the housing project, where (once again) the men asked the children if they "wanted to drink anything or smoke anything." Then he drove to the same motel. On the way (DPP testified), KVM asked DPP what "she ha[d] to do." DPP (parroting Montijo) "told her that she didn't have to do anything she didn't want to do." When they arrived at the motel, the four paired off like last time — Meléndez with KVM, Montijo with DPP —

into separate cabanas. This time, "when [DPP] got into the cabana with [Montijo]," they had sex.

At that point — in a scene Montijo made the centerpiece of his defense — DPP testified that she "took out [her] notebook," and Montijo "saw [her] grade" (which was presumably written on the notebook) and "asked [DPP] how old [she] was." DPP said thirteen. Montijo was "shock[ed]" (shocked!), he tells us. Meléndez and CAP had told him she was sixteen and told DPP that Montijo was twenty. Montijo told DPP that he was really twenty-eight, and that if he'd "known that [she] was [thirteen], he wouldn't have done it." But he assured her he would "wait for [her] to come out of high school" and "was going to take care of [her]."

Montijo and DPP then went to the cabana next door, where they saw Meléndez and KVM naked on the bed. DPP went into the room and "took the money . . . that was right next to [Meléndez]," which she'd been told to take to Montijo. Just then, Meléndez's phone rang. DPP answered it. On the other line, CAP warned that the school had noticed they were gone and the police were waiting there. DPP hung up and gave Montijo the news. Once Meléndez and KVM got dressed, the men (with Montijo driving) drove the girls to a Burger King for an alibi — "so [they] could say" that they'd "been eating."

After the pit stop, Montijo drove the girls back to school, where KVM's father was waiting. He ran toward the car.

- 6 -

KVM got out, but before DPP could follow, Montijo sped off. He drove to a house, where Meléndez spoke to a man DPP didn't know. The man ushered the three of them (Montijo, Meléndez, and DPP) into a van and drove them back to the housing project, where they waited "for things to calm down." When the coast seemed clear, another man drove Montijo and DPP to a street near the school, where they dropped off DPP.

**The Trial**

A federal grand jury indicted Montijo and Meléndez on a slew of sex crime charges. Specifically, count one charged that Montijo "used a facility and means of interstate commerce, namely the cellular phone application 'KIK,' to knowingly persuade, induce, entice, and coerce a 13-year-old minor female [DPP] to engage in sexual activity for which any person may be charged with a criminal offense under the laws of . . . the Commonwealth of Puerto Rico," which violated 18 U.S.C. § 2422(b). Four other counts (one per victim per drive) charged him with transporting the minors in a "commonwealth, territory, or possession of the United States" with the same illicit intent, violating 18 U.S.C. § 2423(a).

The indictment charged Meléndez under the same statutes and added four unrelated charges against him for producing child pornography, which agents had found stored on his cell phone when

they searched it.[3]   Before long, Meléndez entered a plea deal with the government and copped to one count of producing child pornography.   In exchange, the government dropped the remaining counts.   He was sentenced to 192 months in prison.

Montijo went to trial.[4]   To prove its case, the government called CAP, DPP, the motel owner (to describe the joint), KVM's father, and several government agents from the Department of Homeland Security Investigations (HSI) task force who'd investigated the case.   CAP told the jury how she met Meléndez at the family party and narrated the first drive to the motel, when Meléndez had sex with her.   Then DPP recounted both drives, the KIK chats, and how Montijo had sex with her on the second trip to the motel.   By the end of her testimony, when she

---

[3] When they searched Meléndez's phone, agents found several videos of Meléndez having sex with at least one other minor girl who confirmed in an interview that she was sixteen at the time. See United States v. Montijo-Maysonet, 318 F. Supp. 3d 522, 535 (D.P.R. 2018).

[4] Before that, as we'll explain later, Montijo moved the trial judge to dismiss the transportation charges, arguing that based on United States v. Maldonado-Burgos, 844 F.3d 339 (1st Cir. 2016), § 2423(a) required travel to or from Puerto Rico and did not apply to drives wholly within the island.   The district judge denied the motion, holding, as we later did, that § 2423(a) covers defendants who transport a minor wholly within Puerto Rico. See Cotto-Flores, 2020 WL 4582283, at *9.

described how Montijo told her he'd "wait for [her] to come out from high school" and "take care of [her]," DPP broke down sobbing.

In his defense, Montijo did not dispute DPP's story or try to undermine her testimony. He agreed that the two went on a "blind date" set up by Meléndez, and that on the second "date," they "had sex" (quotes from his lawyer's opening statement). But he claimed that he thought DPP was older. During DPP's cross examination, Montijo's lawyer got her to describe Montijo's reaction to the notebook ("If I knew you were thirteen I wouldn't have done it") and hammered that line home in her statements to the jury.

Among other witnesses, the government called HSI Special Agent Jose García, who testified he took Montijo's phone during the arrest and sent it to forensics to extract the data. Then, over Montijo's objections (more on them later), Task Force Officer Kimbelly Pérez-Morales took the stand to identify the report showing the texts found on Montijo's phone. As Officer Pérez explained, the report showed that on the morning of November 24, 2015, before the duo picked up DPP and CAP for the first motel trip, Montijo texted Meléndez to ask what he was wearing to meet the girls — a pair of "white Nike shorts, a tank top and white Nike tennis shoes," answered Meléndez. Before they left, Meléndez

texted Montijo, "Broooo you are horny like a dog.  hahahaha."[5]  He told Montijo they were "leaving at about 7:55" and that "[w]e have to take them [back] before 11."  Meléndez explained:  "we have to leave these girls before others from Marchand" (the middle school) "are out at noon and catch us.  Hahahaha."

The jury found Montijo guilty on all counts.  The judge denied Montijo's motions for judgment of acquittal and sentenced him to 198 months in prison.  Montijo now appeals.

## OUR TAKE

### Sufficiency

We start with Montijo's sufficiency challenges, which he mounts against each count of conviction.  First, he claims there was too little evidence to show he used KIK to "persuade, induce, entice, or coerce" DPP to have sex, as § 2422(b) demanded.  Second, he argues that the proof was too thin to show he knew DPP was underage, which the jury had to find to convict him under either statute of conviction.  Finally, he turns to the last two "transportation" charges under § 2423(a), arguing that the

_____

[5] Meléndez actually said, "estas pegado como los perros," a Puerto Rican colloquialism.  According to the trial judge (with whom defense counsel agreed), the phrase literally translates to "stuck like dogs," which alludes to when "dogs . . . are stuck together" while mating.  The defense pointed out that it doesn't quite mean "horny like a dog," as the interpreter translated, but the government thought that was the "best available translation," and the district court let it stand.  Montijo hasn't challenged that decision on appeal, so we assume that "horny" roughly captures how Meléndez described Montijo.

government didn't prove he intended CAP or KVM to have sex with Meléndez when he drove them to the motel. Montijo argues — as he must to show insufficiency — that these holes in the government's case mean that no rational jury could have found "beyond a reasonable doubt" that the government "proved the essential elements of the crime." United States v. Dwinells, 508 F.3d 63, 72 (1st Cir. 2007). If Montijo is right, we must order acquittal. See Burks v. United States, 437 U.S. 1, 18 (1978) (holding that "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient"). So we tackle these challenges first and take them in order.

*Count One: Enticement*

To prove the first count, the government had to show that (as charged in the indictment) Montijo used KIK, a "means of interstate commerce," to "persuade, induce, entice, or coerce" DPP to "engage in any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2422(b). Here, the "criminal offense" the government alleged Montijo "enticed" and "induced" was sexual assault under Puerto Rico law. See P.R. Laws Ann. tit. 33, § 5191(a) (defining sexual assault to include sex with someone under sixteen); United States v. Saldaña-Rivera, 914 F.3d 721, 724 (1st Cir. 2019) (explaining that the alleged

- 11 -

"chargeable sexual activity" under § 2422(b) "includes crimes defined by" state and Puerto Rico law).

Montijo's opening shot takes aim at the first element: he urges that "no evidence, other than" DDP's "uncorroborated" testimony, showed that he used KIK to chat with her. But even uncorroborated testimony can suffice to sustain a conviction. See United States v. Gaudet, 933 F.3d 11, 15 (1st Cir. 2019) (holding a minor victim's uncorroborated testimony sufficed); United States v. Cortés-Cabán, 691 F.3d 1, 14 (1st Cir. 2012) (explaining that "[w]e repeatedly have held that" even "'the uncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible'" (quoting United States v. Torres-Galindo, 206 F.3d 136, 140 (1st Cir. 2000))). And here, DPP's story wasn't uncorroborated; CAP backed it up, telling the jury that Montijo and DPP texted each other while CAP chatted with Meléndez. And DPP's story went unrebutted. So the jury could easily have bought it.

Even so, Montijo argues, the messages DPP testified he sent over KIK — that he "wanted to see [DPP] again" and to go on another "vuelta" to the motel, which they planned on the app — were not "coercive or enticing in nature." He points out that in our cases applying § 2422(b) thus far, the defendants sent lewd online messages (to the minor or an adult they thought was the minor's parent) that expressly referenced sex acts. See United

- 12 -

States v. Dávila-Nieves, 670 F.3d 1, 3–6, 11 (1st Cir. 2012); United States v. Berk, 652 F.3d 132, 134–35, 140 (1st Cir. 2011); Dwinells, 508 F.3d at 73. Other circuits agree that "when a defendant initiates conversation with a minor, describes the sexual acts that he would like to perform on the minor, and proposes a rendezvous to perform those acts, he has crossed the line toward persuading, inducing, enticing, or coercing a minor to engage in unlawful sexual activity." United States v. Goetzke, 494 F.3d 1231, 1237 (9th Cir. 2007).[6] But those cases didn't draw a line in the sand to insist on explicit sexual overtures. Nor did Congress, which meant to cast a broad net (consistent with the Constitution) to catch predators who use the Internet to lure children into sexual encounters. See H.R. Rep. 105-557, 21, 1998 U.S.C.C.A.N. 678, 678–79, 690 (June 3, 1998).[7] In line with that

---

[6] In those cases, the defendants never had sex with their targets, like Montijo did. They were your typical to-catch-a-predator scenarios, where the defendant is arrested before he meets the child, or the "child" is a federal agent in disguise. The defendants were charged with "attempt[ing]" to "persuade, induce, entice and coerce" a minor, which is also a crime under § 2422(b). Berk, 652 F.3d at 140; see also Dávila-Nieves, 670 F.3d at 6; Dwinells, 508 F.3d at 67–68, 72–74; Goetzke, 494 F.3d at 1237.

[7] As the Third Circuit has explained, "[t]he first version of § 2422(b) . . . was attached to the Telecommunications Act of 1996" with "very little" legislative comment. United States v. Tykarsky, 446 F.3d 458, 467 n.4 (3d Cir. 2006). "Because the Child Protection and Sexual Predator Punishment Act of 1998 rewrote § 2422(b)," raised the maximum penalty, "and made substantial changes to related laws," including § 2422(a), courts have looked to its legislative history to shed light on § 2422's purpose and

intent, the four verbs Congress used — including "entice" and "induce" — plainly reach implicit coaxing or encouragement designed to "achieve . . . the minor's assent" to unlawful sex. Dwinells, 508 F.3d at 71; see Webster's Third New Int'l Dictionary, Unabridged, available at http://unabridged.merriam-webster.com (defining "entice" as "to draw on by arousing hope or desire: allure, attract" and "induce" as "to move and lead . . . by persuasion or influence"). That makes sense: people "entice" and "induce" each other to have sex all the time without spelling it out.

That's just what Montijo did here — so the jury could've found. Remember, when he texted DPP on KIK, they'd already gone on one "ride." And it wasn't to a McDonald's: He drove to a motel that (it could be inferred without much effort) was designed for

---

scope. Id. The House Judiciary Committee explained that the 1998 Act responded to "highly publicized news accounts in which pedophiles" used the web to "seduce or persuade children to meet them to engage in sexual activities," and confirmed its intent to enact "a comprehensive response to the horrifying menace of sex crimes against children, particularly assaults facilitated by computers . . . by providing law enforcement with the tools it needs to investigate and bring to justice those individuals who prey on our nation's children." H.R. Rep. 105-557, 10, 21, 1998 U.S.C.C.A.N. 678, 678-79, 690 (June 3, 1998); see also id. at 21 (explaining that the bill expanded § 2422(a) to "enable law enforcement to charge a defendant who attempts to lure individuals into illegal sexual activity" even where "the travel did not take place"); United States v. Nestor, 574 F.3d 159, 162 (3d Cir. 2009) (describing the amendments as "part of an overall policy to aggressively combat computer-related sex crimes against children").

- 14 -

discrete sex, where the men each paid $20 for a few hours and coupled off with one of the girls. Once alone in the bedroom, Montijo wooed DPP — told her she had "beautiful eyes and hair" — and assured her she "didn't have to do anything [she] didn't want to," a ploy (the jury could've thought) to gain her trust. Meanwhile, CAP and Meléndez actually had sex in the other room (something Meléndez and CAP likely told their companions about, the jury could reason). And before all this went down, Meléndez had told Montijo he was "horny like a dog." Jurors don't have to check "common sense" or "mature experiences" at the courthouse door. United States v. Hernandez, 995 F.2d 307, 314 (1st Cir. 1993) (quoting United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992)). With that context in mind, the jury could have used those attributes to find that by telling DPP he wanted to get another room together at the motel where her friend had had sex with Meléndez the first go-round, and by making a plan to do so, Montijo meant to "entice" and "induce" her to meet up for sex. And it could have inferred he succeeded. After all, when the two met again (the jury could've found), Montijo got exactly what he wanted. See United States v. Montijo-Maysonet, 318 F. Supp. 3d 522, 530 (D.P.R. 2018) (rightfully pointing out that DPP "traveled to the Jackeline Motel [the second time] only because she and Montijo planned the . . . 'ride' on KIK," and observing that the fact that DPP had sex with Montijo "only after exchanging text

- 15 -

messages on KIK supports the inference that [ ] Montijo's communications persuaded" her to do so).

Which brings us to Montijo's last attack on the enticement count.  Montijo argues that to prove he "knowingly" enticed or induced DPP to have sex "for which [he could] be charged" under Puerto Rico law, the government had to prove he knew DPP was under sixteen years old (the Puerto Rico age of consent, P.R. Laws Ann. tit. 33, § 5191(a)) when he sent the KIK messages.[8]  The government counters that at least two other circuits have held that § 2422(b) does not permit a mistake-of-age defense.  See United States v. Banker, 876 F.3d 530, 539–40 (4th Cir. 2017); United States v. Daniels, 685 F.3d 1237, 1246–50 (11th Cir. 2012); but see United States v. Cote, 504 F.3d 682, 686 (7th Cir. 2007) (reading the statute to require knowledge the victim was under eighteen to avoid a First Amendment problem); United States v. Meek, 366 F.3d 705, 718 (9th Cir. 2004) (holding "that the term 'knowingly' refers both to the verbs — 'persuades,

---

[8] Montijo also argues that § 5191(a) — the Puerto Rico offense at issue — requires the defendant to know the victim was under sixteen when they had sex.  But he does not explain why this would matter, since § 2422(b) does not demand the defendant commit — or even intend to commit — the local offense itself, see Dwinells, 508 F.3d at 71 (holding, again, that § 2422(b) "criminalizes an intentional attempt to achieve a *mental* state — a minor's assent — regardless of the accused's intentions vis-à-vis the actual consummation of sexual activities with the minor"); Saldaña-Rivera, 914 F.3d at 724 ("Nothing in the language of section 2422(b) requires the government to show that Saldaña himself could have been charged under Article 130.").

- 16 -

induces, entices, or coerces' — as well as to the object — 'a person who has not achieved the age of 18 years'").  The trial judge held that our decision in Dwinells puts us on the Seventh and Ninth Circuits' side of the split; and as a result, he held that the government had to prove Montijo knew DPP was under eighteen.  See United States v. Montijo-Maysonet, 292 F. Supp. 3d 568, 569 (D.P.R. 2018) (citing Dwinells, 508 F.3d at 68, 71 (concluding that § 2422(b) did not raise First Amendment issues because it "requires that a defendant possess the *specific intent* to persuade, induce, entice, or coerce *a minor* into committing some illegal sexual activity," and "[s]peech intended deliberately to encourage minors' participation in criminal sexual conduct" can constitutionally be outlawed)(emphasis the trial judge's)).  In essence, Montijo goes one step further, arguing that the word "knowingly" in § 2422(b) requires the defendant to know not only that the victim was under eighteen, but that someone could be "charged with a criminal offense" for having sex with her — and since the relevant Puerto Rico offense requires the victim be under sixteen, the government had to show Montijo knew that, too, when he did the enticing.

But even if Montijo is right on the law — an issue we don't decide — the jurors had ample evidence that Montijo knew DPP was younger than sixteen when he texted her.  For starters, he picked her up outside a middle school.  And Montijo knew DPP went

to school there: Meléndez texted him that morning that they had to drop the girls off at "Marchand" (the name of the school). The jurors' "collective experience" would have told them that middle schoolers are rarely over fifteen years old. See United States v. Hamie, 165 F.3d 80, 84 (1st Cir. 1999) (explaining that jurors can "take full advantage of their collective experience and common sense" (quoting United States v. O'Brien, 14 F.3d 703, 708 (1st Cir. 1994))); Tr. of Trial Day 2 at 103 (where the judge noted that "16-year-olds are usually in eleventh grade"). The evidence also suggested Montijo knew they'd be in trouble if someone caught them with the girls. Before the first drive, Meléndez texted Montijo that they "had to leave" DPP and CAP before "others from Marchand" realized they were gone, so no one would "catch" the men. And when they did drop the girls off, Montijo and Meléndez insisted they get out a few blocks away from the building, so school staff wouldn't see them. To top it off, photos of DPP and her friends showed the jurors how the children looked in 2015 — well under sixteen, the jury could have found.

In his defense, Montijo stresses his reaction when DPP told him she was thirteen: he exclaimed that Meléndez had told him she was older, and that he "wouldn't have done it" if he'd known her real age. But given the swell of other proof washing over them, the jurors could have reasonably found that Montijo's protestations just confirmed he knew DPP was underage. Conscious

- 18 -

he broke the law (they could have inferred), he feigned shock to cover his own hide, hoping DPP would buy it and vouch for him if the cops found out.  In short, the jurors didn't have to believe the excuse Montijo gave DPP.  Such credibility determinations are "uniquely" theirs (not ours) to make.  See United States v. Rivera-Ruiz, 244 F.3d 263, 268 (1st Cir. 2001).

*The Transportation Counts*

Undeterred, Montijo moves to the four § 2423(a) counts, which charged that he "knowingly transported" CAP, DPP, and KVM in a "commonwealth, territory, or possession of the United States" with the intent that each engage in sexual activity for which someone (either he or Meléndez) could be charged with a crime — again, sexual assault under Puerto Rico law.  18 U.S.C. § 2423(a); see also P.R. Laws Ann. tit. 33, § 5191(a).

On that score, he first claims that that statute requires travel "in interstate or foreign commerce with respect to [Puerto Rico]," and doesn't cover rides from schools to motels within the island's borders.  But we recently rejected that argument, holding Puerto Rico is a "commonwealth" within the meaning of the Act. See Cotto-Flores, 2020 WL 4582283, at *7–9; 18 U.S.C. § 2423(a) (covering transportation "in any commonwealth . . . of the United States").  If that's true, Montijo claps back, then the statute violates the equal protection component of the Fifth Amendment, because it treats defendants who transport minors within Puerto

- 19 -

Rico differently from those who do the same thing within a state, with no justification for the disparity.

Ordinarily, a law survives an equal protection challenge if the distinction it draws is "rationally related to a legitimate government interest."  United States v. Vaello-Madero, 956 F.3d 12, 18 (1st Cir. 2020) (quoting U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 533 (1973)).  Montijo urges that in this case, our review should have more bite.  Laws that single out certain "discrete and insular minorities" who lack political power for disfavored treatment, Bruns v. Mayhew, 750 F.3d 61, 66 (1st Cir. 2014) (quoting Graham v. Richardson, 403 U.S. 365, 372 (1971)), or intentionally classify people "based on national origin, ancestry, and race" must "withstand the strictest constitutional scrutiny," DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 36 (1st Cir. 2001).  In Montijo's view, that's the deal here.  People in Puerto Rico (he urges) are a protected class — so by targeting them, § 2423(a) triggers strict scrutiny.  And even if not, Congress lacked a rational basis to regulate conduct in Puerto Rico that it does not regulate in the states.

As Montijo concedes, he did not raise this claim below, so we review it for plain error — a "demanding" uphill climb.  United States v. Ríos-Rivera, 913 F.3d 38, 43 (1st Cir. 2019).  To scale its heights, Montijo had to identify "controlling precedent" that made it "indisputable" that § 2423(a) violates the Fifth

- 20 -

Amendment. Id. (quoting United States v. Morosco, 822 F.3d 1, 21 (1st Cir. 2016)). He hasn't done so. To be sure, it's crystal clear a law targeting people of Puerto Rican origin would draw the strictest scrutiny. See DiMarco-Zappa, 238 F.3d at 36. But § 2423(a) has a broader sweep: it applies to anyone (tourists, transplants, and travelers) who transports a minor for criminal sex on the island. No controlling case holds that folks join a protected class once they set foot in Puerto Rico. Indeed, under existing precedent, even the millions of U.S. citizens who live there — who can't influence by vote the federal laws that regulate them (unless they leave their homes for the mainland) — have not been recognized as a protected class, even though they're "the very essence of a politically powerless group." United States v. Vaello Madero, 356 F. Supp. 3d 208, 214 (D.P.R. 2019). Rather, in Harris v. Rosario, the Court held that, without violating the Constitution's Equal Protection mandate, Congress could "treat Puerto Rico differently from States so long as there [was] a rational basis for its actions." 446 U.S. 651, 651–52 (1980); see also Vaello-Madero, 956 F.3d at 21–23 (holding it was "beyond question" that "precedent require[d] us to apply rational basis review to the question before us" — whether a federal benefit program that discriminated against Puerto Rico residents violated

Equal Protection — while noting that Harris was a summary disposition that should be read narrowly).

Therefore, in Ríos-Rivera, we rejected the same argument Montijo raises — that § 2423(a) warrants "heightened scrutiny" even on plain error review — because Harris foreclosed it. 913 F.3d at 44. Like Montijo, "Ríos d[id] not seriously challenge the notion that Congress may have limited [§ 2423(a)]'s applicability within the fifty states because it implicitly recognized potential constitutional limits on its power." Id.; see United States v. Morrison, 529 U.S. 598, 618 (2000) (blocking a Congressional attempt to regulate intrastate violence "not directed at the instrumentalities, channels, or goods involved in interstate commerce," whose regulation "has always been the province of the States"). We held, therefore, that § 2423(a)'s differential treatment of states and territories did not clearly lack a rational basis. See Ríos-Rivera, 913 F.3d at 44. And so we must here.

Having struck out swinging at the statute itself, Montijo turns back to the facts. As the judge instructed, to prove the four § 2423(a) counts, the government had to show: first, that Montijo transported DPP, CAP, and KVM within Puerto Rico; second, that each girl was then under eighteen; and third, that when Montijo transported each girl, he intended she engage in "sexual activity" for which someone could be charged with a criminal offense under Puerto Rico law. Montijo doesn't dispute

- 22 -

the first two elements.  Instead, he argues the evidence was insufficient to prove he intended CAP, DPP, or KVM to have unlawful sex when he took them to the motel.

This claim has two parts.  First, Montijo raises another mistake-of-age argument:  that he did not know the girls were under sixteen (Puerto Rico's age of consent, remember) when he drove them to the motel.  We've already held that to convict under § 2423(a), the jury need not find the defendant knew the person he carted off had "not attained the age of 18 years" such that the statute covered them.  18 U.S.C. § 2423(a); see United States v. Tavares, 705 F.3d 4, 20 (1st Cir. 2013).  Undaunted, Montijo (as in his § 2422(b) argument above) urges that a defendant can't "inten[d]" that a minor "engage" in sex "for which any person can be charged with a criminal offense" unless he knows that the sex would be criminal under local law; so when the alleged local offense is statutory rape of a minor, he must know the victim was under the local-law age of consent to have the "intent" § 2423(a) requires.[9]

Second, Montijo urges that even if he can't raise a mistake-of-age defense — or even if the evidence showed he knew

_____

[9] Montijo also argues, as he did with § 2422(b), that when the intended local offense permits a mistake-of-age defense, § 2423(a) should too.  But as above, we need not reach this claim.

- 23 -

the girls were too young — the jury could not have concluded he intended all three to have sex once they got to the motel.

Once again, however — even if Montijo is right on the law (an issue we need not decide) — the jury had ample proof that he knew the victims were each under sixteen, and that he intended they'd have sex with one of the men when he took them to El Jackeline.  In case you forgot:  as to their age, the girls' child-like looks and the school they emerged from were dead giveaways, the jury could've found.  If that didn't tip off Montijo, Meléndez's instructions — to drop them off at the school before noon so staff wouldn't "catch us" — would have raised some red flags.  So did the school uniforms DPP and KVM wore on the second trip.  Rounding things off, Montijo's evasive behavior — dropping the girls off down the street from the school so staff wouldn't see them — would have shown he got the picture.  See Pueblo v. Alicea Hernández, 2014 WL 7500964, at *19 (P.R. App. Ct. 2014) (finding sufficient evidence to reject mistake-of-age defense under § 5191(a) where defendant met a 15-year-old at school and took her to a motel, where she hid in the back of the car to avoid being seen).  And as for intent, between Meléndez's texts (calling Montijo "horny"), Montijo's flirting (telling DPP she had pretty hair and eyes), the offers to give the girls smokes and drinks, and, oh right — the two drives to a sex motel — the jury had what it needed to convict.  See United States v. Ray, 831 F.3d 431, 434

- 24 -

(7th Cir. 2016) (holding that defendant's actions in offering minor alcohol and marijuana, checking into a motel room for a four-hour stay, and having sex with the minor sufficed to show his intent to have sex with her); see also United States v. Morales-de-Jesús, 372 F.3d 6, 21 (1st Cir. 2004) (explaining that "[w]hen a plausible read of the record supports the verdict, we will not overturn the jury's determination on appeal").

## Officer Pérez's Testimony

Having lost his sufficiency challenges, Montijo launches a procedural attack. He argues that the trial judge should not have let Officer Pérez testify about the text messages taken off Montijo's cell phone, and about the KIK application itself, without being qualified as an expert in "cell phone extractions or forensic analysis." Appellant's Br. at 27; see Fed. R. Evid. 701, 702. We test such claims for abuse of discretion. See United States v. Spencer, 873 F.3d 1, 14 (1st Cir. 2017).

In the world of evidence, there are two kinds of witnesses: lay witnesses and experts. To give an expert opinion, a witness must be "qualified" by "knowledge, skill, experience, training, or education" to do so, and the judge must vet the opinion to ensure it's "reliable." Fed. R. Evid. 702; see Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 97 (1st Cir. 2020)

- 25 -

(citing Daubert v. Merrell Dow Pharm., 509 U.S. 579, 589 (1993)).

Lay witnesses not so qualified may only give testimony that is

> (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. That last (c) prong was added to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701, Advisory Committee's note to the 2000 amendments. In short, a lay opinion must "result[ ] from a process of reasoning familiar in everyday life." Id.; see United States v. Vega, 813 F.3d 386, 394 (1st Cir. 2016).

As best we can tell, Montijo urges that two opinions Pérez gave relied on expert knowledge.[10] First, Pérez identified words on a spreadsheet (a/k/a, an "extraction report") as the text messages Montijo exchanged with Meléndez, which agents extracted from Montijo's cell phone. The government argues Pérez's "testimony was limited to the fact that . . . she had seen the data extraction report from Montijo's cell phone and recognized it in court." In fact she went further than that: she identified certain texts (e.g., "what are you wearing") as messages sent from

---

[10] Since Montijo doesn't develop any claim for why any other statements Pérez made required expert knowledge, we deem other such arguments waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Montijo to "Puky" (Meléndez's nickname, remember) and other texts (e.g., "you are horny like a dog") as sent from "Puky" to Montijo. She also testified to the date and time the texts were sent. To do so, however, all she did was to read from the report, which labeled each string of text as an "SMS message" "to Puky" or "from Puky," with the date and time. Montijo does not explain why this testimony required "scientific, technical, or specialized knowledge." And we conclude it didn't.

These days, most anyone with a cellphone knows they store information about text messages, including the sender, recipient, and content. You don't need to be a software engineer to pick up a cellphone, open a messaging application, and interpret the words in the bubbles as messages sent and received. In doing so, ordinary people rely on a "process of reasoning familiar in everyday life," not any expert knowledge about software coding or cellphone circuitry. If Officer Pérez had opened Montijo's phone and taken screenshots of his conversations with Meléndez, no one suggests she'd need any "scientific, technical, or specialized knowledge" to identify them as text messages. See United States v. Ganier, 468 F.3d 920, 926 (6th Cir. 2006) (noting that certain "[s]oftware programs . . . may be as commonly used as home medical thermometers," such that "[t]he average layperson today may be

able to interpret the[ir] outputs . . . as easily as he or she interprets everyday vernacular").

In this case, investigators used forensic software to copy that same info from Montijo's phone and display it on paper. To be sure, most of us don't see "extraction reports" every day. But as we've held time and again, Rule 701 lets in "particularized knowledge" that police officers gain on the job, so long as it's "well founded on [their] personal knowledge and susceptible to cross examination." Vega, 813 F.3d at 394 (explaining that in this circuit, a "police officer noticing patterns of behavior across criminal operations" — like code words or what a "drug point" looks like — "uses straightforward logic to conclude a defendant's behavior fits within that pattern and thus, does not need to be qualified as an expert") (quoting United States v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir. 2005))); see also United States v. Belanger, 890 F.3d 13, 25 (1st Cir. 2018) ("[T]ime and again we have stated that Rule 701 lets in 'testimony based on the lay expertise a witness personally acquires through experience, often on the job.'" (quoting United States v. George, 761 F.3d 42, 59 (1st Cir. 2014))).

No less than an experienced drug agent decoding drug deals, or an investigator construing a plain-language billing chart he found in a suspect's home, see Vega, 813 F.3d at 395 (holding that a lay case agent properly "interpreted a chart

- 28 -

listing medical equipment and containing a column reading 'Rep. payment' as evidence that" the defendant's medical-device company paid sales reps illegal kickbacks "based on the equipment they sold"), Pérez simply interpreted the plain language (like "SMS message" and, well, "to" and "from") on the spreadsheet, which was labeled with the case number and "which phone it was extracted from" (Montijo's) — statements that Montijo does not now challenge on hearsay grounds.  None of that testimony "turn[ed] on or require[d] a technical understanding of the programming or internal mechanics of the [forensic extraction] technology." United States v. Marsh, 568 F. App'x 15, 17 (2d Cir. 2014) (holding agent's testimony that he used software to "retrieve text messages and other data from a cellular phone" and explaining "the contents of the messages retrieved from the phone" was lay testimony for that reason); see also United States v. McLeod, 755 F. App'x 670, 673 (9th Cir. 2019) (same).[11]  She relied on simple "logic and

_____

[11] Under Rule 701(b), "where the witness is no better suited than the jury to make the judgment at issue," the opinion must be excluded to "provid[e] assurance against the admission of opinions which would merely tell the jury what result to reach." United States v. Vázquez–Rivera, 665 F.3d 351, 363 (1st Cir. 2011)). Montijo does not argue that Pérez's testimony was inadmissible under that prong, so we do not address that issue. See Zannino, 895 F.2d at 17 (explaining that arguments undeveloped on appeal are waived).

pattern recognition" — "a process of reasoning familiar in everyday life."  Vega, 813 F.3d at 394-95.[12]

Second, Pérez testified that KIK is "different from other instant text messaging services" because "once the messages have been deleted they can't be recovered from the phone," "even with . . . law enforcement forensic tools."  She knew this, Pérez said, because she'd become "familiar" with KIK through her "duties investigating child exploitation crimes."  Montijo objects that this was an expert conclusion that required technical knowledge about the KIK application.  In the government's eyes, though, Pérez's two cents about the app relied on nothing more than "lay expertise" she'd gained "through experience . . . on the job" — which made it admissible.  United States v. Habibi, 783 F.3d 1, 5 (1st Cir. 2015) (quoting George, 761 F.3d at 59).

This one is a closer call, but Habibi is a helpful guidepost.  In that case — a prosecution for illegal gun possession

_____

[12] By the way, Pérez "offered no assurances about how well [the extraction software] performed."  United States v. Chavez-Lopez, 767 F. App'x 431, 434 (4th Cir. 2019) (finding no plain error in admitting agent's testimony identifying text messages he'd extracted from cell phone).  Had Montijo wanted to challenge the reliability of the extraction process or suggest the software may have malfunctioned, he could have called his own expert or the forensic analyst(s) who conducted the extraction.  As it stands however, aside from his Rule 701 argument, he does not contend that the jury lacked a sufficient basis to conclude that the data on the extraction report was just what Pérez "purported [it] to be."  United States v. Appolon, 715 F.3d 362, 371 (1st Cir. 2013) (discussing the requirements for authenticating evidence).

— eyewitnesses had testified they saw the defendant pick up the gun with his bare hands and stash it in his basement. Id. at 3. Yet, test results found no DNA on the gun that belonged to the defendant. Id. at 4. To show the negative tests didn't doom its case, the government called an FBI agent to testify that he'd worked on cases "in which [his] investigation revealed that an individual touched or handled a[n] object with a bare hand, but when tested, no detectable DNA was found on that object." Id. at 5. Over the defendant's objection, we held that the challenged testimony relied "only on [the agent's] investigative experience" and so fell "'comfortably within the boundaries of lay opinion testimony.'" Id. at 5-6 (quoting United States v. Valdivia, 680 F.3d 33, 50 (1st Cir. 2012)).

Officer Pérez's testimony skirted closer to the line. Instead of just saying she'd worked on cases in which suspects sent messages on KIK that weren't recovered, she went a step further — testifying that the government's forensic software "can't" recover KIK messages once they've been deleted. That conclusion arguably "require[d] a technical understanding" of the government's forensic tools and their capabilities. Marsh, 568 F. App'x at 17. But even if it was error to admit that testimony, the mistake was harmless. See Kotteakos v. United States, 328 U.S. 750, 765 (1946) (explaining that, even if the trial judge erred, we should affirm if the record minus the improper testimony

- 31 -

gives us "fair assurance . . . that the [jurors'] judgment was not substantially swayed by the error").  On direct, Pérez made clear that, like the agent in Habibi, she was testifying based only on her lay experience in past investigations with the task force.  And on cross-examination, she made it pellucid that she had no "training in forensic tools."  Those clarifications dampened the risk that the jury gave determinative weight to her description of the government's forensic capabilities.  See Torres-Galindo, 206 F.3d at 141 (holding agent's arguably improper expert testimony to be harmless based on his "extensive[ ] cross-examin[ation] by defense counsel" and the weight of the evidence against the defendant).

This and the other evidence that Montijo used KIK to entice DPP makes it "highly probable" that Pérez's testimony about the app "did not contribute to the verdict."  Vega, 813 F.3d at 395 (quoting United States v. Amador-Huggins, 799 F.3d 124, 129 (1st Cir. 2015)).  Remember, DPP testified that Montijo used the app to get her to go on the second "vuelta" — and CAP confirmed he and DPP texted each other.  Montijo never seriously disputed DPP's testimony — indeed, just the opposite:  he asked the jury to credit her account of his "shock" in the motel room (when he "learned" she was thirteen).  And the motel records, KVM's father, and Montijo's text messages backed up the main thrust of her story.  On the other hand, Montijo never argued that the KIK messages were

- 32 -

recoverable, or that the government's failure to introduce them meant DPP lied when she described them.  Given DPP's otherwise corroborated and unrebutted testimony, which Montijo has never seriously disputed, it is "highly [im]probable" Pérez's one-liner on KIK was the gamechanger.  Vega, 813 F.3d at 395 (quoting Amador-Huggins, 799 F.3d at 129).[13]

**Sentence**

His convictions secure, Montijo claims the judge botched his sentencing.  In reviewing federal sentences, we take a two-step approach:  we ensure the judge (first) followed the prescribed procedures and (second) imposed a sentence within the range of reason.  See Gall v. United States, 552 U.S. 38, 51 (2007). In other words, we review "for procedural and substantive reasonableness."  United States v. Hernandez-Maldonado, 793 F.3d

---

[13] To the extent that Montijo argues that Pérez gave expert testimony when she said that KIK used the Internet, that, too, was harmless.  As a cell phone application, KIK qualifies as "a facility or means of interstate commerce" under § 2422(b) whether it used the Internet or a cellular network to send messages.  See United States v. Evans, 476 F.3d 1176, 1180 (11th Cir. 2007) (explaining that defendant's use of a landline and cell phone was enough to establish the "facility or means" element of § 2422(b) because "[t]elephones and cellular telephones are instrumentalities of interstate commerce"); see also United States v. Gilbert, 181 F.3d 152, 158 (1st Cir. 1999) (explaining that "a telephone is an instrumentality of interstate commerce" regulable under the Commerce Clause); United States v. Giordano, 442 F.3d 30, 41 (2d Cir. 2006) (holding that a phone is a "facility or means of interstate . . . commerce" under a similar statute, 18 U.S.C. § 2425).

223, 227 (1st Cir. 2015). Montijo claims the judge flunked both tests here. In his telling, the judge botched the guideline math — a "significant procedural error," Gall, 552 U.S. at 51 — and imposed an unreasonable sixteen-and-a-half-year sentence. To test these theories, we review the judge's "interpretation of the Guidelines de novo, [his] findings of fact for clear error, and [his] judgment calls for abuse of discretion." United States v. Houston, 857 F.3d 427, 432 (1st Cir. 2017).

*Procedural Reasonableness*

Before we flesh out Montijo's claims, here's what you need to know. At each federal sentencing, the judge "*must* begin [his or her] analysis" by calculating the defendant's advisory guideline range. Peugh v. United States, 569 U.S. 530, 541 (2013) (quoting Gall, 552 U.S. at 50 n.6). The range turns on two variables. First, the U.S. Sentencing Guidelines assign each defendant a "total offense level" — a point score based on the "specified offense or group of offenses" plus "adjustments for any aggravating or mitigating factors." United States v. Martínez-Benítez, 914 F.3d 1, 2 n.2 (1st Cir. 2019). Next, they place the defendant in a category (I through VI) based on his criminal history. Id. The judge then plots those two numbers on a chart (a/k/a the "sentencing table") and "ends up with an advisory prison range," id. — the "starting point and the initial benchmark" for determining the sentence. Gall, 552 U.S. at 49. "From there, the

- 34 -

judge sees if any departures are called for, considers various sentencing factors, and determines what sentence (whether within, above, or below the suggested range)," Martínez-Benítez, 914 F.3d at 2 n.2, is "sufficient" and no more than "necessary" to serve the goals of sentencing, 18 U.S.C. § 3553(a).

When a defendant is convicted of multiple counts, computing the first factor — the "total offense level" — is "no picnic." United States v. Ponzo, 853 F.3d 558, 586 (1st Cir. 2017). "The guidelines tell courts to 'group' the counts that 'involv[e] substantially the same harm,' U.S.S.G. § 3D1.2, and then do 'group-by-group, not count-by-count, sentencing calculations.'" Id. (last quoting United States v. Bivens, 811 F.3d 840, 842 (6th Cir. 2016), and citing U.S.S.G. §§ 3D1.3, 3D1.4). "The court then calculates the offense level for each count within each group, attributes to each group the highest offense level of any count within it, compares the groups to ascertain which has the highest offense level, [and] considers certain further adjustments[.]" United States v. Florence, 143 F.3d 11, 14 (1st Cir. 1998). Those "further adjustments" include an up-to-five level enhancement — also called a "multiple count adjustment" — based on the number of groups and their relative severity. See U.S.S.G. § 3D1.4. Once the judge makes those

tweaks, he winds up with the total (or "combined") offense level, which he plugs into the chart.  See Florence, 143 F.3d at 14.[14]

The judge worked through that maze here and pegged the guideline range at 235–293 months in prison.  He started with the base offense level for each of the six counts of conviction, then notched them up with a series of enhancements.  Montijo disputes three on appeal:  first, the judge added a two-level enhancement to each count involving DPP[15] because he found Montijo "unduly influenced [her] to engage in prohibited sexual conduct."  U.S.S.G. § 2G1.3(b)(2)(B).  Second, he tacked on two levels to the triplet of counts derived from the second daytrip[16] because those "offense[s] involved the use a computer or an interactive computer service to [ ] persuade, induce, entice, coerce, or facilitate the travel of" each minor victim (DPP and KVM) "to engage in prohibited sexual conduct."  U.S.S.G. § 2G1.3(b)(3)(A).  Third, after adding those plus-factors, the judge found that each offense had inflicted

_____

[14] The grouping rules aim to limit "the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct" when a defendant is charged with "closely intertwined" offenses. USSG Ch.3, pt. D, intro. comment.  "In essence, counts that are grouped together are treated as constituting a single offense for purposes of the guidelines."  Id.

[15] Counts one, three, and five — which charged Montijo enticed DPP and transported her twice to engage in unlawful sex acts.

[16] Counts one, five, and six — which charged Montijo enticed DPP and transported her and KVM to engaged in unlawful sex acts on the second outing.

"substantially" separate "harm," U.S.S.G. § 3D1.2, so he didn't group them together. Then, as the Guidelines direct, he took the offense with the highest offense level (34) and added a four-point multiple-count adjustment. Id. § 3D1.3, 3D1.4. The judge made all those adjustments over Montijo's objections — which he repeats on appeal. We address his grievances in the order he argues them.

Montijo first complains that he did not "unduly influence[ ]" a minor, to trigger the two-point bump under § 2G1.3(b)(2)(B). To apply that enhancement, the judge had to "closely consider the facts of the case to determine whether [Montijo's] influence over" DPP "compromised the voluntariness of [her] behavior." Houston, 857 F.3d at 435 (quoting U.S.S.G. § 2G1.3, cmt. n.3(B)). As Montijo agrees, the court could "look to a variety of factors, including whether [the offender's conduct] displays an abuse of superior knowledge, influence and resources." United States v. Root, 296 F.3d 1222, 1234 (11th Cir. 2002). When the alleged influencer is over ten years older than the victim, as here, there is a "rebuttable presumption" the enhancement applies. Houston, 857 F.3d at 434 (citing U.S.S.G. § 2G1.3, cmt. n.3(B)). In Houston, for example, we held the judge properly applied the increase when the defendant drove a 13-year-old girl between two states so his accomplice could prostitute her. Id. at 435. The district court found the defendant drove the minor "across state borders away from her family and familiar surroundings" to "various

- 37 -

locations to meet with adult" johns, "giving her few options other than engaging in prohibited sexual conduct." Id. In this case, taking cues from Houston, the trial judge applied the two-point bump under § 2G1.3 because Montijo drove DPP away from school to an unfamiliar motel and was "much older" than her.

Montijo argues that we must find he rebutted the undue-influence presumption by showing that DPP (with CAP and Meléndez) planned the first meeting without his input and that DPP "willing[ly]" had sex during the second one. But even assuming he proved those facts, the judge did not err in applying the enhancement. As in Houston, Montijo was well over ten years older than DPP, who needed her mom to drive her to middle school. He had the know-how and "resources," Root, 296 F.3d at 1234, to pick her up, drive the car, pay for the motel room, and drop the girls off before they were caught. No, Montijo wasn't an interstate sex trafficker like Houston. Montijo's few-hour excursions with DPP were shorter and arguably less coercive. But § 2G1.3 turns on "undue influence," not coercion, and there was ample proof Montijo unduly influenced DPP from the beginning: offered her "something to smoke or drink," brought her to a secluded motel where he flattered her "eyes" and "hair," gained her trust, followed up over KIK, and lured her again "from her family and familiar surroundings" to the same motel room where, alone with Montijo, she'd more likely agree to have sex. Houston, 857 F.3d at 435;

see United States v. Lay, 583 F.3d 436, 445 (6th Cir. 2009) (upholding the enhancement when the "facts [were] consistent with a manipulative adult's building a relationship with a minor for the purpose of eventual sexual activity").  In these circumstances, the judge was well within his discretion to find that Montijo's influence "compromised the voluntariness of [DPP's] behavior" and to apply the increase.[17]

As for Montijo's second claim — that he didn't use a computer to "entice" or "facilitate the travel of" DPP or KVM to have unlawful sex, U.S.S.G. § 2G1.3(b)(3)(A), we've already explained why it flops:  there was sufficient trial evidence to show that Montijo used KIK to entice DPP to come on the second trip.  As the government points out, the guideline goes beyond the

---

[17] This case therefore differs from United States v. Calvo, 596 Fed. Appx. 541, 543 (9th Cir. 2015), hammered by Montijo.  In Calvo, there was unrebutted evidence the victim initiated pretty much everything — that she "willingly befriended Calvo, voluntarily engaged in sexual banter with him, requested that he pick her up, and willingly engaged in the sexual acts at issue" and "[t]here [was] simply no evidence that Calvo did or said anything to procure the victim's consent to conduct that she was not already inclined to do." Id.  In this case, there's no evidence DPP was the one who "requested" Montijo pick her up or that she was "already inclined" to have sex — if that matters, see id. at 544 (Christen, J., concurring in part and dissenting in part) (citing cases around the circuits holding that the minor's "willingness" does not bar an undue-influence finding); there's no evidence DPP "requested" that Montijo do anything or was willing to have sex with Montijo before he took her to a secluded motel and came on to her.  Indeed, DPP did not agree to have sex until the second trip (if she did at all) — after Montijo spent six more days pursuing her on KIK.

four verbs in § 2422(b) to cover computer use that "facilitate[s] the travel of" minors for unlawful sex.  Id.  Since the evidence showed Montijo used KIK to plan the second outing with DPP and KVM, the judge appropriately applied the enhancement.  See Houston, 857 F.3d at 436 (affirming the district court's application of the enhancement because the defendant's accomplice used her smartphone to arrange sexual encounters between the victim and adult men).

Lastly, Montijo faults the judge for the multiple-count adjustment. In his view, the judge should have grouped the three counts involving DPP (the enticement under § 2422(b) and the two transportation counts).  If he'd done that, there would have been fewer groups of offenses, and the multiple-count adjustment would have been three instead of four.

The on-point guideline is § 3D1.2, which explains in the relevant snippet that "[c]ounts involve substantially the same harm within the meaning of this rule" and should be grouped

> (a)  When counts involve the same victim and the same act or transaction[;]
>
> (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan[; or]
>
> (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

U.S.S.G. 3D1.2.

- 40 -

Montijo does not dispute that each count involving a separate minor inflicted a "substantially" separate "harm" and deserved its own group. U.S.S.G. § 3D1.2; see id. § 2G1.3, cmt. n.6. That said, he argues that "all acts related to [DPP] encompassed one victim and one act (the transportation)" under prong (a), "or in the alternative, one victim and one common scheme (to meet with [DPP] at the motel)" under prong (b). "[C]ounts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim are to be grouped together, even if they constitute legally distinct offenses occurring at different times," he reminds us. U.S.S.G. § 3D1.2, cmt. n.4. For example, a conspiracy to commit extortion and the extortion itself (though different offenses) are grouped — as are mail and wire fraud counts that were "each in furtherance of a single fraudulent scheme," "even if the mailings and telephone call occurred on different days." Id. But there's a flip side: the guideline "does not" permit "the grouping of offenses" that do not reflect "one composite harm," such as "robbery of the same victim on different occasions," which "involves multiple, separate instances of fear and risk of harm." Id. (noting that if "[t]he defendant is convicted of two counts of rape for raping the same person on different days" the counts should stay separate).

- 41 -

Unlike an agreement to commit the same crime, or mails and wires sent to further the same scam, Montijo's two trips to the motel with DPP exposed her to two different sexually-charged encounters — away from familiar surroundings — to which she couldn't legally consent. See United States v. Nagel, 835 F.3d 1371, 1374 (11th Cir. 2016) (concluding that district court properly refused to group two § 2422(b) counts because each "one of the[ ] sexual encounters with [the victim] — who was unable to consent due to her age — caused a separate harm"); United States v. Bivens, 811 F.3d 840, 843 (6th Cir. 2016) (holding that two instances of creating child pornography involving the same victims were separate because, in cases involving "sex crimes committed by the same defendant against the same victim over an extended period of time," "each act usually amounts to a fresh harm the victim must face anew"); see also United States v. Wise, 447 F.3d 440, 447 (5th Cir. 2006) (holding court rightly refused to group counts based on separate explicit photos defendant solicited from child on separate days). And Montijo "had two separate objectives, to have sexual relations with [DPP] two separate times," Nagel, 835 F.3d at 1375 — even if he didn't succeed on the first drive. So the judge did not err in treating the two transporting-DPP counts separately.

Given that outcome, any mistake in grouping the enticement and day-two transportation count was harmless. If the

judge had treated those counts as separate offenses, he would have only decreased the number of "units" for the multiple-count-adjustment by one (to 3.5), meaning the four-point enhancement would still have applied. See U.S.S.G. § 3D1.4 (equating 3.5-5 units with a four-level increase). All told, then, the judge rightly assessed the disputed enhancements and correctly computed the guideline range of 235-293 months in prison. See United States v. Hinkley, 803 F.3d 85, 93 (1st Cir. 2015) (noting that a mistake in applying the Guidelines is ordinarily harmless if it does not change the guideline range).

*Substantive Reasonableness*

Unable to show nonharmless procedural error, Montijo urges that his 198-month sentence — a 37-month downward variance — was still unreasonably high. In doing so, he fights an "uphill" battle: we have to affirm so long as the judge gave "'a plausible explanation' for the selected sentence and 'reached a defensible result.'" United States v. Dávila-Bonilla, 968 F.3d 1, 12 (1st Cir. 2020) (first quoting United States v. Vixamar, 679 F.3d 22, 29 (1st Cir. 2012), then quoting United States v. Chisholm, 940 F.3d 119, 132 (1st Cir. 2019)). We'll overturn a sentence as substantively unreasonable only if it goes beyond the "expansive universe of reasonable sentences.'" United States v. King, 741 F.3d 305, 308 (1st Cir. 2014). "When, as in this case, a district court essays a substantial downward variance from a properly

- 43 -

calculated guideline sentencing range, a defendant's claim of substantive unreasonableness will generally fail."  United States v. Floyd, 740 F.3d 22, 39-40 (1st Cir. 2014).

Montijo argues that this case is the "long-odds exception" — the "rare below-the-range sentence" that remains unreasonably harsh.  King, 741 F.3d at 310.  He stresses that he'd "never had a brush with law enforcement" and had supportive family and a "promising future" — factors that warranted no more than a 120-month sentence.  But the district judge considered those positives:  he noted in court that Montijo had a university degree, was gainfully employed, and "was raised in a pro-social environment with the support of his parents who worked tirelessly to provide for their children."  And he heard defense counsel's reminder that Montijo's family was there at sentencing and "all" the previous hearings, and that "having a family to return to after" prison bodes "well for positive rehabilitation upon release."  See Dávila-Bonilla, 968 F.3d at 12 (explaining that "we can infer that the district judge considered a defendant's sentencing claims by comparing what the parties argued and what was in the presentence report with what the judge did").  That the judge varied downward by 37 months confirms that he weighed those points heavily.  But he also considered Montijo's "repeat" conduct (on two separate days) and the "impact" it had on DPP and her family. And in doing so, he found that a 198-month sentence was needed to "reflect[ ]

the seriousness of the offense," "promote[ ] respect for the law," and ensure adequate "deterrence and punishment" — factors the law directed him to consider. Though the judge gave less weight to the "mitigating factors" than Montijo "thinks they deserved," Dávila-Bonilla, 968 F.3d at 12 (quoting Clogston, 662 F.3d at 593), the reasons the judge outlined were "fully sufficient to justify" Montijo's substantially-below-guideline sentence. King, 741 F.3d at 310.

### END

So, our careful review complete, we affirm Montijo's convictions and sentence.